Darwin HASELHUHN,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 85–268.

Supreme Court of Wyoming.

Oct. 31, 1986.

Leonard D. Munker, State Public Defender, Martin J. McClain, Deputy State Public Defender, and Julie Naylor, Appellate Counsel, for appellant (defendant).

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Allen C. Johnson, Sr. Asst. Atty. Gen., and John W. Renneisen, Sr. Asst. Atty. Gen., for appellee (plaintiff).

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

THOMAS, Chief Justice.

In this appeal, which is taken from a conviction of aggravated robbery, in violation of § 6–2–401(c)(ii), W.S.1977 (June 1983 Replacement), Darwin Haselhuhn asserts a series of errors relating to his trial. The issues to be addressed include a claim that a witness should not have been permitted to testify because he had been hypnotized; error for failing to grant a continuance in order to obtain expert testimony relating to hypnosis; the failure of the prosecution to make available evidence perceived to be of assistance to the defendant; error in introducing the results of a polygraph examination relating to a third person; improper argument in the form of testimony by the prosecutor; and a claim of a denial of the right of confrontation because a codefendant, at the time the oath was administered to witnesses, asserted that he would rely upon his Fifth Amendment right and refuse to testify. It is our conclusion that no reversible error is found in any of the matters asserted by Haselhuhn, and the judgment and sentence entered in the district court is affirmed.

On April 21, 1984, the Safeway Store in Green River, Wyoming was robbed by two male individuals, one armed with what appeared to be a sawed-off shotgun and the other armed with a knife. Thereafter a criminal complaint was filed in the county court charging the appellant with armed robbery. After a preliminary hearing, the appellant was bound over to the district court for further proceedings. An information charging the identical offense as that charged in the complaint subsequently was filed in the district court, and appellant pleaded not guilty when arraigned upon that information. The case was tried to a jury, and it returned a verdict finding Haselhuhn guilty of aggravated robbery. Haselhuhn was sentenced to a term of not less than eight years nor more than twelve years in the Wyoming State Penitentiary. It is from this judgment and sentence that Haselhuhn appeals.

In his brief in this court Haselhuhn presents a statement of the issues by listing six arguments as follows:

"I. Whether Appellant was denied his due process rights to notice and the opportunity to be heard because the trial court denied his motion for a continuance.

"II. Whether hypnotically enhanced recollections should be admissible and whether it is the State's burden to establish at a hearing out of the jury's presence that any hypnosis done by the State did not alter the witness' recall in any fashion.

"III. Whether the prosecution failed to abide by its constitutional obligation 'to assist the defense in making its case' and whether a reversal is mandated because the evidence the prosecution did not disclose was material to a just resolution of the facts.

"IV. Whether the prosecutor improperly used closing argument to testify to the jury that neither he nor Officer Jaramillo had hidden anything from the defense.

"V. Whether it was plain error for the prosecution to introduce the results of a polygraph exam.

"VI. Whether Appellant was denied his right to due process by the presentation to the jury of his co-defendant's invocation of the Fifth Amendment."

The statement of the issues by the State of Wyoming is:

"I. The denial of Appellant's motion for a continuance was proper and did not result in abridgement of his due process rights.

"II. The State did not offer hypnotically-enhanced testimony. Appellant had adequate notice and opportunity to impeach the testimony of the witnesses who were hypnotized.

"III. The Prosecution did not withhold from Appellant any material that can be considered *Brady* material.

"IV. The Prosecutor's rebuttal argument was a fair response to the Appellant's assertions that he was denied access to exculpatory information, and was in any event harmless.

"V. No reversible error resulted from the mention of a polygraph exam.

"VI. There was no reversible error committed when the Appellant's accomplice said he would take the Fifth Amendment if called to testify."

While some additional detail will be alluded to in connection with the disposition of the several issues in this case, the significant facts begin in the evening hours of April 21, 1984. Prior to closing time for the Safeway Store, three employees saw Haselhuhn enter the store. He was known to the store employees because he was a member of the crew employed by the contractor who maintained the floors in the store. None of the employees saw Haselhuhn leave. Haselhuhn admitted that he was present in the store the night of the robbery but asserted that he was there in connection with his work on the maintenance crew. Haselhuhn's co-defendant also was observed in the store prior to closing time, and, as with Haselhuhn, no one saw him leave. Haselhuhn admitted that he spent the evening with his co-defendant, but, of course, denied participation in the robbery. Not long after the store was closed at 10:00 P.M., the assistant store manager and a store clerk were balancing the books and working on the cash accounting in a cage which was locked most of the time. They observed two men, one wearing a ski mask and the other a Halloween mask, approaching the cage from the rear of the store. One of the men was armed with what appeared to be a sawed-off shotgun and the other with a knife. When the men reached the cage, they demanded the store money from the assistant store manager and the clerk.

Then they took the two victims to the rear of the store, bound them with duct tape, and left through a delivery door which could be opened only from the inside. It was necessary for them to take a key from the clerk in order to open the delivery door. Soon after the robbers left, the store employees managed to free themselves and summoned the police. When the police arrived, the assistant store manager and the clerk gave statements as to what had occurred. The assistant store manager advised the police officers that he was able to peek under the duct tape which the robbers had placed over his eyes and see one of them who had removed his ski mask. The store manager was able to furnish a physical description of the robber, describe the robber's clothing, and advise the officers that he recognized the robber as one of the cleaning men but that he could not remember the man's name. Later when the assistant store manager was shown a xeroxed array of photographs, he indicated

that the photograph of the appellant might be the robber but pointed out that the hair was styled differently. The store clerk who had been a victim identified the photograph in the array as that of Haselhuhn, but she had not seen the robber without his mask. The store clerk, however, did furnish a description of the clothes, masks and weapons. Both the assistant manager and the clerk identified the voice of the co-defendant from a taped voice array.

Some time later, both the assistant manager and the clerk were interviewed under hypnosis by a non-professional with meager training in hypnotic techniques. This interview occurred prior to the preliminary hearing. At the preliminary hearing, the assistant store manager positively identified Haselhuhn as the robber he had seen. He even explained that he had removed his glasses to make the circumstances as similar as possible to the situation in the store at the time of the robbery, and he testified that he knew for sure that Haselhuhn was the robber. In his testimony at the trial the assistant manager again identified Haselhuhn as the robber.

Other testimony at the trial was introduced from three witnesses who testified that Haselhuhn had made statements to them which connected him with the robbery. A different witness testified that Haselhuhn and the co-defendant had visited him at his home on the night of the robbery. He stated that he did not know precisely what time they were at his home and conceded that they may have been there during the time that the robbery occurred or they may not have been there at that time.

As part of his trial strategy, Haselhuhn endeavored to focus suspicion upon a third party who was connected to a sawed-off shotgun that had been retrieved from the Black's Fork River. In the course of examination concerning this shotgun, counsel for Haselhuhn asked one of the police officers what follow up had been accomplished with respect to the ownership of that shotgun and the reason for its presence in the river. The police officer testified that an-

other detective had interviewed the third person and secured a polygraph examination of the third person. Thereafter the prosecution pinpointed the result of the polygraph examination which was exculpatory with respect to the robbery so far as the third person was concerned.

In his rebuttal argument the prosecuting attorney felt compelled to deny closing argument by counsel for Haselhuhn that evidence had not been made available to Haselhuhn. When objection was made the district judge permitted the prosecutor to proceed with his argument.

The co-defendant was subpoenaed as a witness at Haselhuhn's trial although he never was called to testify. In accordance with the practice of the court, all witnesses were sworn at once prior to the trial. At that time, it was observed that the co-defendant had not been sworn, and the district judge directed that the oath be administered to him. The co-defendant, however, then advised the court that he would rely upon his right not to testify against himself and that he would refuse to testify at the trial. In response to this occurrence, Haselhuhn requested a mistrial, but he made no request for any cautionary instruction.

█ We shall address first the issues relating to the admissibility of the testimony of identification by the store manager and the refusal of the trial court to grant a continuance. We have adopted the rule that hypnosis raises an issue of credibility with respect to the testimony of a witness, but the fact that the witness has been hypnotized does not render the witness incompetent to testify. *Chapman v. State*, Wyo., 638 P.2d 1280 (1982). While this court has been divided on the question, that rule was followed in *Gee v. State*, Wyo., 662 P.2d 103 (1983), and *Pote v. State*, Wyo., 695 P.2d 617 (1985). Haselhuhn argues that the court now should adopt a rule of incompetency of the witness rather than the rule of credibility. Haselhuhn argues that because the assistant manager could not remember the name of the cleaning crew member he thought to be the robber and because he could not identify a

xeroxed photo of Haselhuhn with a different hair style as either the robber or a member of the cleanup crew, we must conclude that his testimony was enhanced by the hypnosis. The assistant store manager, as we have noted, was able to make a positive identification of Haselhuhn when he saw him in person at the preliminary hearing.

This case is like *Pote v. State*, supra, with respect to the fact that the testimony of the assistant store manager was not enhanced by virtue of the hypnotic interview. At the trial the assistant manager denied that his testimony was enhanced by the hypnotic session. The hypnotist also testified that the interview did not elicit any additional information from the assistant store manager beyond that which he had previously furnished. The testimony of the assistant store manager at the preliminary examination and at the trial was consistent with the statement first given to the police on the night of the robbery. The only difference was that the assistant store manager was able to identify Haselhuhn as the robber when he saw him in person. His explanation of his ability to identify Haselhuhn at that time rules out any impact of the interview under hypnosis. This case is similar to *Chapman v. State*, supra, in which defense counsel did not elicit any indication that the testimony of the witness was enhanced by hypnosis. It also is similar to *Gee v. State*, supra, in that the identification factors remained the same following hypnosis, and further, the identification by the assistant store manager was cumulative to other strong evidence of Haselhuhn's guilt. We hold that the store manager did not offer testimony that had been enhanced by hypnosis, and no error occurred in permitting him to testify for that reason. In light of these factors we will not reconsider the rule of competency in this case.

Haselhuhn also complains of the failure of the prosecutor to advise him of the hypnosis of the assistant store manager which this court has said the prosecutor is required to do. *Gee v. State*, supra. We

do not recede from our position that the state must advise the defendant of the fact that a witness has been previously hypnotized and make available to the defendant on request all statements and proceedings relating to the hypnosis. However, we do not discern a failure by the prosecution to comply with those requirements in this instance. The record demonstrates that the state complied with a discovery order entered by the district court. When examining the exhibits maintained by the Green River police department on the day prior to trial, defense counsel discovered a tape of the hypnotic interviews of the store manager and the store clerk. He had been offered access to this information well in advance of trial, but he did not discover the tapes until that moment. There is no reason to believe that the prosecutor was aware of the hypnotic interviews prior to that time. The prosecutor advised the court that he had not been aware of the fact that the witnesses had been hypnotically interviewed until the day prior to trial, and there is no reason to doubt him. Moreover, defense counsel from the time that he knew about the tapes of the hypnotic sessions had the opportunity to listen to them. We said in *Gee v. State*, supra, 662 P.2d at 104:

> "To make such an attack on credibility, the attacking party must of necessity have knowledge of the fact of the pre-trial hypnosis of the witness."

In this case defense counsel had that knowledge. His examinations of the assistant store manager and the hypnotist were accomplished with a good deal of skill based upon that information. He asked the assistant store manager about the hypnotic interview and what occurred. He also thoroughly addressed that subject with the person who had conducted the interview and raised numerous questions concerning the skills and abilities of the hypnotic interviewer. Under these circumstances the prosecution's failure to specifically advise defense counsel of the hypnotic sessions did not violate Haselhuhn's constitutional rights.

■ Haselhuhn insists, however, that under the same circumstances the trial court was guilty of an abuse of discretion in denying his motion for continuance which he asserted was necessary for him to obtain an expert witness on hypnosis. He contends that without an expert available to attack the testimony of the hypnotized witness he was denied due process of law. While we are cognizant of the right of a defendant in a criminal case to adequate representation, we are reluctant to structure a rule which would justify a continuance in every instance in which the defendant first becomes aware of information on the eve of trial which he could have learned about in ample time to prepare an adequate defense. The rule is firm that a motion for continuance is addressed to the sound discretion of the trial court. *Wilde v. State*, Wyo., 706 P.2d 251 (1985), and cases cited therein. No manifest injustice is demonstrated. The denial of a continuance does not appear from the record to have inhibited Haselhuhn's attack upon the previously hypnotized witness. The absence of the proffered testimony of an expert witness who could have explained the impact upon the self-confidence of the hypnotized witness does not constitute a deprivation of Haselhuhn's right to a fair trial required by due process of law. We hold that the district court did not abuse its discretion in denying the continuance in this case.

■ Haselhuhn's next argument is that the prosecution failed to preserve and present to his counsel a statement of the witness who testified that Haselhuhn and his co-defendant visited the home of the witness on the night of the robbery, perhaps during the robbery. Haselhuhn asserts that this failure violated his right to be informed of exculpatory information under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). It seems almost trite to remind Haselhuhn that substantive and procedural legal rules are not an end in themselves. They are the means to an end. That end is to secure to a party a right to a fair trial. If any perceived failure to comply with those rules does not adversely impact the right to a fair trial,

then this court is not disposed to reverse on the basis of purely technical error. If the witness testified truthfully, then Haselhuhn also must have known that he was present at the home of the witness on the night of the robbery. With this information already in Haselhuhn's possession, any failure of the law enforcement officers to record the statement of the witness and then make that information available to Haselhuhn could not have had any material impact upon the presentation of his defense. We note also that the prosecution is under no duty to create evidence; the duty is only that of preserving evidence which may be helpful to the defense. *Chapman v. State*, supra.

Furthermore, it is questionable whether this statement is exculpatory. *Brady v. Maryland*, supra, established the proposition that the prosecution must provide evidence which is material to the defense. In *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976), the Supreme Court of the United States explained that material evidence is that which "might have affected the outcome of the trial." The Brady-Agurs test is a demanding one. *Buzbee v. Donnelly*, 96 N.M. 692, 634 P.2d 1244 (1981). In light of the fact that Haselhuhn had equal knowledge of this information, we do not perceive how the failure of the police to disclose that evidence could have had any effect upon the outcome of the trial. The information was presented to the jury, and apparently the jury found that it did not establish an alibi in view of the other evidence which placed Haselhuhn at the scene of the accident. We hold that there was no error in this regard.

■ Haselhuhn also argues that reversible error occurred when the prosecutor introduced the subject of the polygraph examination which was made of a third party who was a suspect in the robbery and that this violated the rule adopted by this court in *Schmunk v. State*, Wyo., 714 P.2d 724 (1986). A police officer who was called by

Haselhuhn testified on direct examination by Haselhuhn's counsel as followed:

"Q. Now, we've already gone over yesterday the fact of how this particular shotgun was traced to an owner, a man named John Hamilton?

"A. That's correct.

"Q. And that was done through tracing a serial number on it?

"A. Yes, sir.

"Q. All right. And your office contacted this fellow?

"A. Yes, sir.

"Q. And received his explanation for how this gun got in the river?

"A. Yes, sir.

"Q. What I'd like to know is what investigative steps you took after that point.

"A. I turned that part of the investigation over to Detective Thompson."

Defense counsel chose to follow up the preceding examination in this way:

"Q. Okay. What did he end up doing?

"A. He went up and interviewed Mr. Hamilton. Like I says, he traced the steps of where the shotgun had gone, from what point to what point. He then ran the gentleman on a polygraph test. And his conclusion was that the gentleman was telling the truth on the shotgun."

The prosecutor asked when he examined the police officer the following questions to which the indicated answers were given:

"Q. Now, according to your testimony today, that gun originally belonged to a John Hamilton?

"A. Yes, sir.

"Q. And you ran a polygraph, or someone ran a polygraph, about how it got into the river and why?

"A. That's correct.

"Q. And he passed?

"A. That's my understanding.

"Q. Didn't show any deception? The polygraph didn't indicate that he was lying?

"A. No, sir."

No objection was made to this testimony at trial, and Haselhuhn now argues that this constitutes plain error. We are not satisfied that the criteria for plain error articulated in *Hampton v. State*, Wyo., 558 P.2d 504 (1977), and subsequently followed in this court are satisfied by these circumstances. Rather, we are persuaded that if there was any error it was invited by Haselhuhn who opened the door. *Schmunk v. State, supra; Sanville v. State*, Wyo., 593 P.2d 1340 (1979); *Palato v. State*, Wyo., 591 P.2d 891 (1979); *Burns v. State*, Wyo., 574 P.2d 422 (1978); *Pack v. State*, Wyo., 571 P.2d 241 (1977); *Daellenbach v. State*, Wyo., 562 P.2d 679 (1977).

■ With respect to Haselhuhn's claim that he was denied his constitutional right to cross-examine witnesses against him, we understand his argument to be that when his co-defendant, upon the occasion of being administered the oath of a witness in this case, volunteered the information that he would exercise his constitutional right and would refuse to testify. This, in effect, was testimonial conduct by the co-defendant, and Haselhuhn was deprived of an opportunity to cross-examine the co-defendant about that testimonial conduct. As we have indicated, the co-defendant was not called as a witness, and he did not testify. The right of confrontation which is inherent to any fair trial involves cross-examination with respect to testimony that a witness has given. It does not, however, extend to a right to cross-examine a witness who is not called to testify with respect to conduct such as that which occurred in this case. Nothing material to the issues would have been elicited by such cross-examination and the possibility of harm to Haselhuhn would be great indeed. The probability that Haselhuhn wanted the co-defendant to testify truthfully in this case is quite limited. It would appear instead that Haselhuhn prefers to have the claimed error to rely upon in his appeal. We note that Haselhuhn did request a mistrial, but did not ask for any cautionary instruction to the jury. While such incidents should be avoided in the trial of a case, this occurrence is not a ground for reversal. See *Hopkinson v. State*, Wyo., 632 P.2d 79

(1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982).

■ The final contention of Haselhuhn relates to his argument that the prosecutor testified in rebuttal argument and this was reversible error. Haselhuhn's counsel in closing argument said:

"Why are they so interested in distorting the evidence that way? * * * And we never had the chance to nail that [Hunter's statement as to time] down at that time, because it wasn't reported.

\* \* \* \* \* \*

"They'll write down things like that and they'll make notes, but they won't write down anything about a man who says, 'Darwin couldn't have been in the store between ten and ten-thirty.' * * * "

When the prosecutor made his rebuttal argument, he made these comments and counsel for Haselhuhn objected:

"The other thing that really angered me while Mr. Flynn was speaking, is * * * he stands up here and tries to put Joe Jaramillo on trial again, tries to put me on trial again. And you know, he suggested that we hid things from him. I want to tell you right now, ladies and gentlemen, there's a discovery order on file in this case. The Judge has ordered the State to give all of our evidence to the Defendant. We had to do that prior to this trial, prior to you coming in here for voir dire and being questioned. This man had every police report that we had and had offered to have him examine every piece of evidence—

"MR. FLYNN: Excuse me, Your Honor. I wish to object at this point. I don't want to state reasons in front of the jury because I think that would be improper, but the Court, I'm sure, is very much aware of the conference that we had in chambers regarding the hypnosis tape immediately prior to the trial. Because of that basis alone, I think it's improper for this line of argument to continue.

"THE COURT: You may continue. You were given the opportunity to examine everything they had.

"MR. MONEYHUN: So then he suggests to you, after having all our evidence, that we're trying to hide something from him. He knows what our evidence was. He knows what we had. If he could prove to you that we tried— that we did hide something from you, why didn't he?"

In *Browder v. State*, Wyo., 639 P.2d 889 (1982), we held that the prosecutor is not permitted to testify in his closing argument. We also have held in a number of cases that when a defendant opens the door to response such as this, he will not be heard to complain on appeal. If it is a fair response, which we find this to be, to the defendant's argument then entertaining a claim such as this on appeal simply permits a defendant to structure his own reversible error. In accordance with our earlier cases we will not treat this as reversible error. *Sanchez v. State*, Wyo., 694 P.2d 726 (1985); *Bishop v. State*, Wyo., 687 P.2d 242 (1984), cert. denied, 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985); *Freeze v. State*, Wyo., 662 P.2d 415 (1983). As we said in *Freeze v. State*, supra, 662 P.2d at 418, "[t]he appellant opened the door and the prosecutor merely closed it."

We can discern no reversible error in the record in this case. The judgment and sentence is affirmed.

BROWN, Justice, dissenting, in which URBIGKIT, Justice, joins.

Once a member of this court takes a position, nothing short of direction from on high, accompanied by a flash of light and a clap of thunder would cause him to reconsider. I say this because the majority resolutely holds on to a discredited rule of law which it announced in *Chapman v. State*, Wyo., 638 P.2d 1280 (1982), despite weak, if any, support for that position. According to the majority here, this court adopted a rule in Chapman that "hypnosis raises an issue of credibility with respect to the testimony of a witness, but the fact that the witness has been hypnotized does not render the witness incompetent to testify."

In this case two eyewitnesses to the robbery were hypnotized in order to enhance their memories. The hypnotist was a maintenance man at Pacific Power and Light Company. Witness Barney admitted he was initially unable to positively identify appellant as one of the robbers. It was only after having been hypnotized that he was able to positively identify appellant as one of the robbers.

Courts that have addressed the hypnotically enhanced testimony problem have employed three different approaches. One group admits all posthypnotic testimony by holding that pretrial hypnosis affects only the credibility of a witness rather than his or her competency to testify. The second approach admits hypnotically enhanced testimony if procedural safeguards are followed. The third category adopts a rule of per se inadmissibility, allowing the witness to testify only to matters recalled before hypnosis.

Wyoming falls into the first group, that is, hypnosis affects credibility but not admissibility. *Chapman v. State*, supra. It is not clear whether the rule followed by Wyoming was ever a majority rule. It is clear, however, that it is not the majority rule today.

Courts in eleven jurisdictions follow the rule that pretrial hypnosis affects only the credibility of such testimony rather than its admissibility. Twenty-eight jurisdictions have rejected the admissibility of hypnotically enhanced testimony or have restricted its admissibility through the application of procedural safeguards or balancing tests. *Trial by Trance: The Admissibility of Hypnotically Enhanced Testimony*, 20 Colum.J.L. & Soc.Probs. 237 (1986).

In developing the *Chapman* rule this court cited *Harding v. State*, 5 Md.App. 230, 246 A.2d 302 (1968), cert. denied 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969), as its primary authority. Since *Chapman*, however, *Harding* has been overruled. *Collins v. State*, 52 Md.App. 186, 447 A.2d 1272 (1982). As additional support for its determination in *Chapman* the majority also relied on cases from Flor-

ida, Georgia and North Carolina as authority. The cases relied upon from these states have also been overruled. *Bundy v. State*, Fla., 471 So.2d 9 (1985); *Walraven v. State*, 255 Ga. 276, 336 S.E.2d 798, (1985); *State v. Peoples*, 311 N.C. 515, 319 S.E.2d 177 (1984).

When the authority upon which a rule of law is based becomes seriously eroded, the court adopting the repudiated rule should reexamine its position. Not so in this court. In my specially concurring opinion in *Pote v. State*, Wyo., 695 P.2d 617 (1985), citing cases, I noted that *Chapman* represents a rapidly shrinking minority view; it continues to shrink. See *Contreras v. State*, Alaska, 718 P.2d 129 (1986); *State v. Moreno*, Hawaii, 709 P.2d 103 (1985); *State v. Haislip*, 237 Kan. 461, 701 P.2d 909 (1985); *People v. Nixon*, 421 Mich. 79, 364 N.W.2d 593 (1985). Furthermore, I have not found any recent case which adopts the *Chapman* rule, nor does the majority cite any. I conclude, therefore, that there are none.

As previously noted, the cases upon which the *Chapman* majority based its decision have been generally overruled. This court was then left with citing *Chapman* in support of its decision in *Gee v. State*, Wyo., 662 P.2d 103 (1983), and citing *Chapman* and *Gee* in support of its decision here. This court is now basing decisions on previous errors because that is about all there is left.

Legal treatises, generally, condemn the rule that "hypnosis affects credibility but not admissibility." Some treatises suggest safeguards. Casenote, *Look into My Eyes: The Admissibility of Hypnotically-Enhanced Testimony*, 19 Creighton L.Rev. 995 (1985–1986); *Trial by Trance: The Admissibility of Hypnotically Enhanced Testimony*, 20 Colum.J.L. & Soc.Probs. 237 (1986); *Mesmerizing Justice: The Use of Hypnotically-Induced Testimony in Criminal Trials*, 34 Syracuse L.Rev. 927 (1983); Note, People v. Zamarripa: *To Hypnotize or Not to Hypnotize*, 13 Western State U.L.Rev. 651 (1986); Note, *Hypnotically Refreshed Testimony and the*

*Balancing Pendulum,* 4 U.Ill.L.Rev. 921 (1985); Case Comment, *Criminal Law—Admissibility of Evidence—Testimony Refreshed by Hypnosis Fails to Satisfy General Acceptance in Scientific Community Standard,* People v. Hughes, 8 Thur.Mar.L.Rev. 451 (1983); Case Comment, *A New Standard for Admissibility of Hypnotically Refreshed Testimony,* 63 Wash.U.L.Q. 325 (1985); Comment, *Hypnosis of the Accused: Defendant's Choice,* 75 J.Cr.Law & Criminology 995 (1984).

Hypnosis is an investigative or therapeutic tool, and its credibility is suspect as an evidentiary tool. Cases from other jurisdictions and scholarly treatises are contrary to the rule of law as set forth in Chapman and Gee. Furthermore, most scientists in the medical or psychology fields insist that hypnosis is not reliable, and therefore has no place in the courtroom. See 19 Creighton L.Rev. 995, supra. The court should abandon the rule in Chapman.

URBIGKIT, Justice, dissenting.

A series of trial errors compounds the problem discussed by Justice Brown in his dissent, with which I join. The cumulative effect of these additional occurrences deprived Haselhuhn of a fair trial. *Schmunk v. State,* Wyo., 714 P.2d 724 (1986). Therefore, I further dissent by addressing arguments I, III, V, and VI, presented in the appellant's brief.

" * * * It is a fundamental facet of due process that a defendant charged with a crime be afforded the right to establish and present a defense." *State v. Delgado,* 8 Conn.App. 273, 513 A.2d 701, 706 (1986).

See also *State v. Corchado,* 188 Conn. 653, 453 A.2d 427 (1982).

## ARGUMENT I

### Denial of the Motion for A Continuance

A substantial number of appeals have been heard by this court recently which raised the issue of whether a continuance should have been granted. The frequency with which district courts have been denying substantive motions for continuance is alarming, as is the frequency with which this court affirms where fairness, due process and justice are denied. *Gentry v. State,* Wyo., 724 P.2d 450 (1986), Urbigkit, J., dissenting; *Tageant v. State,* Wyo., 683 P.2d 667 (1984); *Sims v. State,* Wyo., 530 P.2d 1176 (1965).

On the day before trial, Haselhuhn's lawyer first learned that the two eyewitnesses, Safeway employees Mr. Barney and Ms. Shively, had been hypnotized in an effort to enhance their recollections of the robber's appearance.[1] This hypnosis occurred after Mr. Barney had been unable to identify the defendant Haselhuhn in a photo line-up and before his positive identification at the preliminary hearing. Haselhuhn's attorney quickly enlisted an expert witness from Lakewood, Colorado, to testify on the effects of hypnosis. However, that witness was unable on such short notice to make the trip from Lakewood to Green River, Wyoming. In order to secure the needed testimony only then recognized, counsel immediately presented a motion for continuance with an affidavit and an overview of that proposed testimony. The motion for continuance was rejected by the court. Denied a minimal opportunity to counter a significant development known only at the last moment involving a clearly questionable trial event, the resulting inability to present available expert testimony singularly affected the fairness and due process of the criminal trial.

In this case, the generally established criteria for determining whether or not there has been a violation of court discretion in denying a continuance align in appellant's favor:

(A) *Substantial prejudice to the litigative rights of the movant party. Tomash v. Evans,* Wyo., 704 P.2d 1296 (1985); *Urich v. Fox,* Wyo., 687 P.2d 893 (1984); and other cases cited in the dissent in *Gen-*

---

1. The hypnotist, a maintenance person at a local power plant, experienced and trained by a 32– hour home course, was admitted by the prosecution to be unqualified as an expert.

*try v. State*, supra. The witnesses against the appellant had been hypnotized by a maintenance person at Pacific Power and Light Company who had taken one 32–hour course to learn his craft. This is a perfect example which merits application of Justice Brown's advice in his specially concurring opinion to his own majority opinion in *Pote v. State*, Wyo., 695 P.2d 617, 632 (1985), that "People who do not know what they are doing ought not 'monkey around' with hypnotism lest they jeopardize an important case and cost the state a lot of money." 695 P.2d at 632. Haselhuhn had a substantial interest in presenting evidence to explain how the hypnotic session may have distorted the witness' recollection and instilled in the witness a suggestion that the accused had committed the crime. His attorney explained to the trial court:

> " * * * [Y]ou don't need to have the witness's story changed in order to have hypnosis take an effect. * * * [I]t's possible simply to enhance the witness's own belief in what he—in whatever story it is that he is telling. And I submit to the Court that a careful review of the evidence we got indicates that's just what happened—has happened in the case of Mr. Barney. As time went by he progressed from an uncertain identification to one that he's dead positive of now. And we've observed in the record here the very effect that the doctor has warned about." [2]

(B) *Presence or absence of contributory responsibility of the litigant to the prejudice. Sharp v. Sharp*, Wyo., 671 P.2d 317 (1983); *Cates v. Eddy*, Wyo., 669 P.2d 912 (1983); *Craver v. Craver*, Wyo., 601 P.2d 999 (1979); and other cases cited in the dissent in *Gentry v. State*, supra. The appellant did not contribute to the prejudice. The appellant lacked the knowledge and a way of obtaining the knowledge that the two witnesses had been hypnotized. A continuance was necessary to allow the appellant to prepare a defense.

(C) *Fairness and justice to the opposing litigant. Higgins v. Johnson*, Fla. App., 422 So.2d 16 (1982); *Winkelman v. Allen*, 214 Kan. 22, 519 P.2d 1377 (1974); *Bairas v. Johnson*, 13 Utah 2d 269, 373 P.2d 375 (1962). The opposing litigant, the State, would not have suffered a denial of fairness and justice had a continuance been granted. No showing was made that any witness or evidence would have been lost because of a continuance, or that the State would have been otherwise prejudiced.

(D) *Court docket control and maintenance, and the general necessity of reaching a conclusion. Gentry v. State*, Urbigkit, J., dissenting, supra. The grant of a continuance to allow the appellant's proposed expert witness an opportunity to travel to Green River would have been sufficient. Court docket control should not prevail over the right of an appellant to present a defense, *United States v. Burton*, 189 A.D.C. 327, 584 F.2d 485, 489 (D.C.Cir.1978), *cert. denied* 439 U.S. 1069, 99 S.Ct. 837, 59 L.Ed.2d 34 (1979), nor over the interests of justice. *Budget Laundry Company v. Munter*, 450 Pa. 13, 298 A.2d 55, 59–60 (1972), Roberts, J. concurring.

I agree with Justice Brown and Justice Rose, dissenting in *Gee v. State*, Wyo., 662 P.2d 103, 107 (1983):

> "Discovery during trial that a state's witness has been hypnotized is useless information. Advice that a witness has been hypnotized immediately before trial is not much better. When a defendant's counsel receives late information on hypnotism, his ability to prepare for trial is impaired. He needs time to prepare cross-examination questions, consult and perhaps call expert witnesses of his own, review the law, check circumstances surrounding the hypnotic sessions, check the qualifications of the person who hypnotized the witness, and review the record of the hypnotic session. Such a process cannot be accomplished immediately before trial or during trial.

**2.** See *People v. Shirley*, 31 Cal.3d 18, 181 Cal. Rptr. 243, 272, 723 P.2d 1354, ——, cert. denied

459 U.S. 860, 103 S.Ct. 133, 74 L.Ed.2d 114 (1982).

"When the ability to prepare for trial is impaired, the right to effective counsel guaranteed by the Sixth Amendment of the United States Constitution is rendered meaningless. The difficulty of adequately cross-examining a previously hypnotized witness constitutes a serious infringement of the right of confrontation."

I also agree that:

"[T]he State should have an affirmative duty to specifically advise defendant of the hypnotism before trial; making the State's files available to defendant is not sufficient to discharge that duty." 662 P.2d at 107.

We have recently defined discretion criteria in *Martin v. State*, Wyo., 720 P.2d 894 (1986) as a composite of many things, among which are conclusions drawn from objective criteria as right under the circumstances, determined from the facts of the case without being arbitrary or capricious. These objective criteria, applied to the facts of this case, define abuse of discretion as well as constitutional error, in contradistinction to the majority decision.

A continuance for the purpose of providing time for the attendance at trial of appellant's expert witness on hypnotism was indispensable for constitutionally required due process, fairness and justice. Neither the Wyoming Constitution in Art. 1, § 7 (no absolute, arbitrary power), and Art. 1, § 10 (right of accused to defend), nor the United States Constitution in Amendments V, VI and XIV countenance this roughshod violation of procedural due process. See *People v. Sorscher*, 151 Mich.App. 122, 391 N.W.2d 365, 369 (1986), "so long as the defendant is allowed to establish the fact of hypnosis and to introduce expert evidence regarding the inherent possibility of confabulation" the danger (of affected recall) is minimized. In this case, not only was evidence as tainted by hypersuggestibility and hypercompliance then used against the defendant, but he was denied an indispensable responsive opportunity to present knowledgable expert testimony in defense. See discussion of hypnotically enhanced identification by the majority, and concurring and dissenting comments in *Vester v. State*, Tex.Cr.App., 713 S.W.2d 920 (1986). See also *Harker v. Maryland*, 800 F.2d 437 (4th Cir.1986); *Beck v. Norris* 801 F.2d 242 (6th Cir.1986); *State v. Moreno*, Hawaii, 709 P.2d 103 (1985); Recent Developments, *State v. Moreno: The Admissibility of Hypnosis Enhanced Testimony in Hawaii*, 8 Hawaii L.Rev. 655 (1986).

## ARGUMENT III

### *Nondisclosure of Exculpatory Information*

This issue raised several violations of the prosecutor's duty to abide by his constitutional obligation to assist the defendant in a fair presentation of his case under *Brady v. State of Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Bagley*, —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In addition to the failure to disclose the use of hypnosis, *Gee v. State, supra*, the prosecutor purposely did not disclose to the defense that the State's witness, Dean Hunter, had told the police officer that Haselhuhn was at his home approximately the same time that the robbery was occurring. The police officer did not make a written record of the statement, and the defense first heard Mr. Hunter's statement during trial.

The majority conclude that this information was not material because Haselhuhn also knew that he (Haselhuhn) was at Hunter's home on the night of the robbery. That conclusion is at best faulty and perhaps further described as totally unjustified. It is not what Haselhuhn knew that is of issue but rather what confirmatory information, if available, could be supportive to his testimony. This is the essence of the prosecutorial duty to disclose.

"The question of the materiality of evidence in the prosecutor's control arises in 'three quite different situations,' [*United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)]. First, where the prosecutor has knowingly used perjured testimony, the judgment

must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' *Id.* at 103–104, 96 S.Ct. at 2397. Second, where defendant has made a specific pretrial request for exculpatory evidence, the judgment must be set aside if 'the suppressed evidence *might have affected the outcome of the trial.*' *Id.* at 104, 96 S.Ct. at 2397 (emphasis added); see *id.* at 104–06, 96 S.Ct. at 2397–98. Third, where defendant has made 'a general request for Brady material,' or has made no request at all, the judgment must be set aside 'if the omitted evidence creates a reasonable doubt that did not otherwise exist.' *Id.* at 112, 96 S.Ct. at 2401 * * *." *Chaney v. Brown,* 730 F.2d 1334, 1339–1340 (10th Cir.), cert. denied 469 U.S. 1090, 105 S.Ct. 601, 83 L.Ed.2d 710 (1984).

In this case, the appellant made a general request for *Brady* information, invoking the standard discussed in *Chaney.* Hunter's testimony could create and likely would have created a reasonable doubt, especially if the defendant had been given the information before trial so he could subpoena or at least question the other participants in the trivial-pursuit game at Hunter's house regarding their recollection of the time that he stopped by to use the telephone. The majority assume that because Hunter remembers where Haselhuhn was on a certain date at a certain time, Haselhuhn would also identically remember. Each of us has a different capability or a different reason for recalling dates and events. The criminal complaint and warrant were issued on June 6, 1984 for a crime committed on April 21, 1984. It is reasonable to believe that Haselhuhn did not know exactly what time he stopped at Hunter's house to use the phone on April 21, six weeks before the complaint was filed against him, as is reasonably found with the average person who may not reconstruct his exact whereabouts on a date six weeks past.

The information, which Hunter gave to the police and of which the policeman chose not to make a record, located Haselhuhn at a place other than the crime scene at the time of the crime. Certainly it was exculpatory, and, since it established an alibi, the evidence created a reasonable doubt that did not otherwise exist. When corroborated by other witnesses, a leak-proof defense might have existed if the facts known to the police and prosecution had been made available to the defense.

The opinion of the court can be construed to encourage law enforcement officers to deliberately exclude exculpatory evidence from police records as a means of avoiding the requirements of Brady. A reversal on this point would send law enforcement officers a different signal. *United States v. Bagley, supra.* Criminal prosecution rather than a game of one-upmanship is the most solemn responsibility of society in enforcing its rules of behavior while affording constitutional rights of the individual charged with the violation. Constitutions, not sporting events, set the determinative standards and principles. Either we have a society ennobled by consistent rules, or a despotism of individual arrogance. As a society, we should not choose to travel the road by paving the pathway with violated principles justified by good intentions. In violation of societal standards, the enforcer lowers himself to an equivalency standard of the accused criminal.

## ARGUMENT V

### Evidence of The Polygraph Test

The court quotes the portion of the transcript wherein the jury was informed that a polygraph examination had been administered to a suspect in the robbery, and then concludes that the plain-error criteria of *Hampton v. State,* Wyo., 558 P.2d 504 (1977) are not satisfied and that the error was invited by Haselhuhn. Our reasoning that the plain-error criteria were met will require a more detailed explanation of the facts.

During the week after the robbery, the investigating detective received the message that a Sweetwater County Jail prisoner wanted to visit with him. The prisoner,

Milt Albaugh, told the detective that his son Rick Albaugh knew about the robbery, that Haselhuhn and co-defendant Rick Prime had committed the robbery, and "that they threw all the weapons and the clothing and everything else in the Black's Fork River." Rick Albaugh later gave the detective the same information, told the detective that he knew where the search of the river was being conducted, and to continue searching at that location. The detective testified that Rick wanted to work a deal to get his father out of jail.

After a concentrated search of the specified location, the police eventually found a sawed-off .20–gauge shotgun in the river. Ownership was traced through the gun's serial number to John Hamilton. Hamilton passed a polygraph examination concerning how his gun got into the river, and the State asserted at trial that the shotgun retrieved from the river was not the one used in the robbery. The jury was told that Hamilton passed a polygraph examination about his explanation why his sawed-off shotgun was in the river, but the jury was never given that actual explanation:

> "Q [By the Prosecutor]: What reason did he [Hamilton] give for throwing the shotgun in the river?
>
> "A [The Detective]: If my memory serves me correctly—this is just what I'm getting from detective Thompson, that he had bought the shotgun and—
>
> "Q I'll tell you what. Let's let Detective Thompson, I assume that he'll be called, let's let him explain."

Detective Thompson was never called.

> " * * * When review is sought under the plain error doctrine, this Court must be able to discern from the record, without resort to speculation or equivocal inference, what occurred at trial, that is, we are entitled to know the particular facts. [Citations.] Further, the proponent of plain error must demonstrate the existence of a clear and unequivocal rule of law which the particular facts transgress in a clear and obvious, not merely arguable, way. [Citations.] If these criteria are met, the error or defect must ad-

versely affect some substantial right of the concept procedurally expressed in Rule 49(a), W.R.Cr.P. [Citations.]" *Hampton v. State, supra,* 558 P.2d at 507.

The first two criteria of Hampton are clearly present. The transcript has fully revealed what occurred at trial. The jury was told that Mr. Hamilton explained how his shotgun got into the Black's Fork River, that a polygraph examination was run on Hamilton, and that he "passed"—that the polygraph didn't indicate that he was lying. Second, there is a clear and unequivocal rule of law which these facts clearly transgress.

> "Generally, the results of a polygraph examination are not admissible in evidence. *Cullin v. State,* Wyo., 565 P.2d 445, 455 (1977). Improper reference to the results of a polygraph examination has been held reversible error. See, e.g. *Birdsong v. State,* Okla.Crim.App., 649 P.2d 786 (1982); *State v. Green,* 271 Or. 153, 531 P.2d 245, 92 A.L.R.3d 1301 (1975). We have approved, upon stipulation of the parties, admission of the results of a polygraph examination. *Daniel v. State,* Wyo., 644 P.2d 172, 178 (1982); *Cullin v. State,* supra, at 455. In the absence of a stipulation for admission, a conviction must be reversed when the results of a polygraph are revealed to the jury. *State v. Sutherland,* 94 Wash.2d 527, 617 P.2d 1010 (1980); *State v. Kilpatrick,* 2 Kan.App.2d 349, 578 P.2d 1147 (1978). The reluctance to admit the results of a polygraph or 'lie detector' examination stems from the fact that the results of these examinations have not been established as reliable. It also stems from a fear that jurors may give too much weight to the results of the examination, even perhaps accepting it as proof of guilt or innocence." *Schmunk v. State,* 714 P.2d at 731.

Finally, the error adversely affected a substantial right of the accused. The jury was informed by a police officer that another investigating officer was convinced that

Hamilton, who never testified, was telling the truth in a polygraph examination regarding how his shotgun came to be in the Black's Fork River. Not only was Haselhuhn denied the right to cross-examine Hamilton, but the statement included one officer's testimony regarding another officer's evaluation of the veracity of the out-of-court statement of another person who was himself a potential suspect, then to be substantiated by a questionable polygraph exam. See *Schmunk v. State*, supra. This is simply not creditable evidence material to the trial issues upon which defendant was convicted. The fact that Milt Albaugh, who was in jail when the crime was committed, knew that a shotgun was used to commit the crime and knew that the shotgun was in the Black's Fork River at a particular location, and the fact that the shotgun was found at that location, are too corroborating to allow the jury to rely on the investigating officer's conclusion, substantiated by polygraph, that this particular shotgun was not used in the robbery. The testimony violated Haselhuhn's Sixth Amendment right to cross-examine another potential suspect. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562, (1975). I am satisfied that the plain-error criteria of *Hampton v. State, supra*, have been met by the appellant. Additionally the believability quotient of the total events reminds us why polygraph is rejected as scientifically reliable. Everyone in Sweetwater County is not in the habit of leaving sawed-off shotguns in Black's Fork River[3] at the identical place where the informant said the robbery weapon could be found. The old expression, "You lie, and I will swear to it," might be replaced by "You lie, and we will prove it is true by polygraph." *State v. Beachman*, 189 Mont. 400, 616 P.2d 337 (1980). See, however, Sevilla, *General Symposium, The Polygraph and the Courts, Polygraph 1984: Behind the Closed Door of Admissibility*, 16 U.W.L.A. L.Rev. 5 (1984).

"In sum, while the polygraph shows promise, the research on its validity is too limited in quantity, relevance, and generalizability to support its use as evidence. Further, problems with drugs, countermeasures, effects of repeated testing, friendly polygrapher effects and the statistical rates of true guilt, suggest the lie detector results could be very misleading to triers-of-fact. Additionally, problems with biases against innocent subjects and anticipated hung trials and court costs argue that as a matter of social policy, this evidence will simply cost too much. The current data do not support the necessity of creating a new forensic industry: the truth business." Beaber, *General Symposium, The Polygraph and the Courts, Not Guilty by Reason of Polygraph*, 16 U.W.L.A. L.Rev. 27, 35 (1984).

## ARGUMENT VI

### *Co-defendant's Invocation of The Fifth Amendment*

Appellant's final assertion of error is an example of prosecutorial misconduct which should not be accepted by this court. Appellant's co-defendant, Rick Prime, who was scheduled for trial after the appellant, was subpoenaed as a witness by the State. Four days before appellant's trial began, Rick Prime's attorney notified the prosecutor in writing of Prime's intention to exercise his Fifth Amendment rights and to remain silent at appellant's trial in response to each and every question. Despite this notice, Prime was called by the State, appeared at appellant's trial and invoked his Fifth Amendment rights in front of the jury when he was sworn in as a witness. This obviously would have an effect on the jury and consequently elicited a reaction from counsel for defendant:

---

**3.** Black's Fork River is a small mountain stream headwatered in the Wasatch Mountains in Utah, running generally easterly through Uinta County and western Sweetwater County in Wyoming to join with the Green River. It is not a likely place for two people to each deposit a sawed-off shotgun at about the same location within its approximately 70–mile journey in western Wyoming.

"Your Honor, if I might be heard on it. It's my opinion, Your Honor, that simply calling this man [Rick Prime] to have him stand in front of the jury and take the Fifth is in and of itself testimonial. And aside from that, I don't think I need to talk at all about the prejudicial effect that's going to have on the jury. The Court was there yesterday and saw what happened with the jury when Rick Prime took the Fifth when he was sworn in. And I think for the prosecution to call a witness under these circumstances, knowing what they know, is tantamount to prosecutorial misconduct."

It is not possible to discern from the record how the jury reacted. Everyday experience bears out the prejudicial effect which this probably had on the jury which apparently the defense attorney observed. The most offensive part of this is the prosecutor's advance knowledge that the co-defendant would remain silent and then his blatant use of that co-defendant to prejudice the jury in appellant's trial by a kind of nontestimonial evidence.

This is probably the most egregious error of all defects found in this record. This is the "If you do not have the evidence, try prejudice" prosecutorial opportunity. The courtroom event of that individual later to be identified as a co-conspirator, in being called before the jury at that early stage to take the oath of a witness with anticipated and realized Fifth Amendment response, probably determined the jury verdict before any evidence was ever introduced. The testimony of the defendant when given later had essentially been destroyed in advance.

The Washington Supreme Court has explained the rule which applies here:

" * * * It is forbidden for a prosecutor to call a witness, knowing that the witness will invoke privilege, for the purpose of having the jury see the witness exercise his constitutional right. *DeGesualdo v. People,* 147 Colo. 426, 364 P.2d 374, 86 A.L.R.2d 1435 (1961); *State v. Mitchell,* 268 Minn. 513, 130 N.W.2d 128 (1964), cert. denied 380 U.S. 984, 85 S.Ct. 1351,

14 L.Ed.2d 276; *United States v. Tucker,* 267 F.2d 212 (3d Cir.1959); *United States v. Maloney,* 262 F.2d 535 (2d Cir. 1959). It is also error for the prosecutor to call a co-defendant, knowing that he will invoke the privilege. See *State v. Tanner,* 54 Wash.2d 535, 341 P.2d 869 (1959). There is no reason for distinguishing these cases on the basis that the party calling the witness was the government." *State v. Smith,* 74 Wash.2d 744, 446 P.2d 571, 581 (1968), *judgment vacated in part,* 408 U.S. 934, 92 S.Ct. 2852, 33 L.Ed.2d 747 (1972), and *overruled on other grounds sub nom. State v. Gosby,* 85 Wash.2d 758, 539 P.2d 680 (1975).

The Michigan Supreme Court has explained the reason for the rule:

" * * * The American Bar Association standards relating to the prosecution and defense functions provide that it is unprofessional conduct for a prosecutor or a lawyer representing a defendant

\* \* \* \* \* \*

"—'to call a witness who he knows will claim a valid privilege not to testify, for the purpose of impressing upon the jury the fact of the claim of privilege.'

"The rationale of the rule has been explained by the Supreme Court of Iowa:

" 'When an alleged accomplice invokes the privilege in the presence of the jury, prejudice arises from the human tendency to treat the claim of privilege as a confession of crime, creating an adverse inference which an accused is powerless to combat by cross-examination.' *State v. Allen,* 224 N.W.2d 237, 241 (Iowa, 1974).

"A number of state courts have reversed convictions where a prosecutor called an accomplice knowing that he would exercise his Fifth Amendment privilege. *State v. Duhon,* 332 So.2d 245 (La.1976); *Johnson v. State,* 158 Tex.Cr.R. 6, 252 S.W.2d 462 (1952); *DeGesualdo v. People,* 147 Colo. 426, 364 P.2d 374, 86 A.L.R.2d 1435 (1961). Cf. *State v. Vega,* 85 N.M. 269, 511 P.2d 755 (Ct.App.1973)."

*People v. Giacalone*, 399 Mich. 642, 250 N.W.2d 492, 494–495 (1977).

See also *People v. Dyer*, 425 Mich. 572, 390 N.W.2d 645 (1986).

None of the recognized exceptions to the rule of law are present in this case. See, *People v. Scheidt*, 182 Colo. 374, 513 P.2d 446 (1973), where the prospective witness had been granted immunity and the State was not required to assume that the witness would violate the rule by refusing to testify. See also *State v. Moya*, 138 Ariz. 7, 672 P.2d 959 (1983), where the prosecutor had no prior knowledge that the witness would invoke her Fifth Amendment privilege to remain silent. Comment, *Exercise of the Privilege Against Self-Incrimination by Witnesses and Codefendants: The Effect Upon the Accused*, 33 U.Chi. L.Rev. 151 (1965).

The citation of *Hopkinson v. State*, Wyo., 632 P.2d 79 (1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982), is weak or nominal authority to contravene the well-established general principle relating to prejudice in exposing a non-testifying witness to the jury as a form of nonverbal testimony for prosecutorial jury impact.

"* * * The jury may think it high courtroom drama of probative significance when a witness 'takes the Fifth.' In reality the probative value of the event is almost entirely undercut by the * * * fact that it is a form of evidence not subject to cross-examination." *Bowles v. United States*, 142 A.D.C. 26, 439 F.2d 536, 541–542 (D.C.Cir.1970), cert. denied, 401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971).

It is noted that the author of the majority opinion has recently authored a highly emotional philosophic dissent in *Chambers v. State*, 726 P.2d 1269 (1986). Differing completely, I would believe that procedural due process cannot suitably be measured by self-determined guilt in abject disregard of recognized constitutional, statutory and procedural standards.

Only as a recognition of that dissent which is here applied, I would believe that the state and federal constitutions and Bill of Rights cannot be denigrated so that they become available only if innocence is first empirically accepted by the appellate tribunal. This is result-oriented adjudication of the rankest kind. Albert Einstein said it well: "Whoever undertakes to set himself up as a judge in the field of truth and knowledge is shipwrecked by the laughter of the gods."

Critically obvious is the fact that the jury decides with the evidence presented. To say that in believing the defendant to be guilty I then say that the jury was not misled by failure of due process and proper evidence is only to challenge the right and reason of the jury in a fairly conducted trial inquiry. If this is not so, then why did the framers of our constitutions, both state and federal, mandate a right not only of fairness and due process, but of criminal conviction to be accomplished through the jury decision. I cannot accept in this case or any criminal proceeding that there is to be a supervening standard that the end justifies the means. I do know with historical perspective, as more recently demonstrated in the world in crisis and near extinction of the 1930's and 1940's, that the road to hell can truly be paved with self-defined good intentions.

It is a curiosity of high improbability that combined in affirmance of the conviction of Haselhuhn in this case is hypnosis, polygraph, denied continuance, withheld information, and testimony by Fifth Amendment. If he is guilty, which is certainly in some question on this record, then conviction can surely be achieved in a proper trial, with fairness and due process.

Based on this accumulation of errors, several of which are reversible in and of themselves, I would reverse.