672 P.2d 959
**The STATE of Arizona, Appellee,**

v.

**Joe Angel MOYA, Appellant.**

**No. 1 CA–CR 5903.**

Court of Appeals of Arizona,
Division 1.

June 23, 1983.
Rehearing Denied Sept. 19, 1983.
Review Denied Nov. 8, 1983.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Linda A. Akers, Asst. Attys. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by Terry J. Adams, Deputy Public Defender, Phoenix, for appellant.

## OPINION

HOWARD, Chief Judge.

Appellant, tried by a jury in absentia, was convicted of aggravated assault and manslaughter with two prior convictions for assault with a deadly weapon and armed robbery. He was subsequently taken into custody and sentenced to concurrent prison terms of 25 years.

Around midnight of January 2, 1981, appellant rearended a car being driven by Judith Coffee. As she got out of her car, she saw appellant approaching her with a handgun. He put the handgun to her stomach and said, "Get back in the car, bitch." He shoved her and she shoved him back, causing him to drop the weapon. He picked it up and fired three shots. At that time, Mrs. Coffee's husband, who had been in another vehicle, ran up to appellant, struck him with his fist and knocked him down. Appellant then shot Mr. Coffee in the head and throat. Appellant ran to his car. Mrs. Coffee tried to stop him from leaving but she could not. She noticed that there was a woman sitting in the middle of the front seat. Mr. Coffee subsequently died from the gunshot wounds.

The police investigation of the crime led to an automobile owned by Susan Schultz. Three .25-caliber shell casings were found in an ashtray. These casings and the shell casings found at the scene of the crime were fired by the same weapon. A piece of automobile grill found at the scene of the crime also matched the grill of the Schultz car. Officer Richard Fuqua interviewed appellant and arrested him for murder.

At the trial, a witness testified that in June 1981 he had dinner with one Ruth Reynolds, who was employing appellant. Appellant was also present at the dinner. During the dinner there was a conversation between Ruth Reynolds and appellant involving obtaining an attorney. When the witness inquired, appellant stated, "Well, I shot a man and I need a good attorney to defend me." Appellant further explained

that he had been involved in a car accident and shot a person after getting into an argument with him.

Reynolds testified that she had hired both appellant and Sue Schultz as domestic help. Appellant told her that he had been involved in a traffic accident and he had shot and killed someone. He also requested financial help from her to obtain an attorney.

Appellant contends the following: (1) The trial court erred in allowing the prosecution to use statements made by him to law enforcement officers after he had requested counsel; (2) the trial court erred in refusing to grant a mistrial based upon the prosecutor's misconduct; (3) the prosecutor committed fundamental error by presenting evidence that appellant had exercised his right to counsel and commenting on it in his closing argument; (4) the prosecution was guilty of misconduct in calling a witness to the stand knowing she would exercise her Fifth Amendment right not to testify; (5) the trial court erred in admitting hearsay evidence, and (6) the trial court erred in instructing the jury. We affirm.

Appellant's first argument is that the trial court erred in allowing the state to use statements made by him to Detective Fuqua after he had requested counsel. Appellant contends this mandates reversal, citing *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). We do not agree.

Appellant was arrested and taken to the main police building. Det. Fuqua read appellant his constitutional rights. He then asked appellant if he understood them, to which appellant responded by nodding in the affirmative. Appellant then told Det. Fuqua that he wanted an attorney. Det. Fuqua responded, "Okay, fine. My questioning will be terminated."

After invoking his rights, appellant asked Fuqua what it was all about. Fuqua explained that appellant's car, or rather his girlfriend's car, had been identified as being at the location of a shooting at 89th Avenue and Indian School Road. He also said that appellant's photograph had been identified by the victim's wife. Appellant then asked, "How come you waited two weeks to pick me up?" Fuqua responded that the victim had recently died on January 12. The case was then assigned to him and after the investigation pointed to appellant, he was arrested. Appellant then said, "If I was going to kill someone, I wouldn't have my lady with me." Fuqua re-advised appellant of his rights and asked him if he wished to waive his right to remain silent. He said that he did not and there was no further conversation. In *Edwards* the Court stated:

"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" (Emphasis added) 451 U.S. at 484–485, 101 S.Ct. at 1885.

Since it was appellant who initiated further communication and conversations with the police, his statements were admissible.

Appellant next argues that the trial court erred in refusing to grant a mistrial because of prosecutorial misconduct. The misconduct complained of occurred during the re-direct examination of a witness:

"Q: You were asked some questions on cross-examination about statements by the victim that you later learned his name was Allen Gash ___ excuse me—I have another homicide on my mind. That his name was Allen Coffey [sic]?
A. Yes."

Appellant subsequently moved for a mistrial on the ground that the mention of another "murder case" was prejudicial. The trial court denied the motion for mis-

trial, which appellant claims was error. We do not agree. The decision to grant a mistrial is left to the sound discretion of the trial court which, absent an abuse of discretion, will not be disturbed on appeal. *State v. Trotter,* 110 Ariz. 61, 514 P.2d 1249 (1973). There was nothing suggesting that this murder had any connection whatsoever with appellant and it was an obvious slip of the tongue.

■ During the presentation of the evidence the state called two witnesses, both of whom talked with appellant after the incident had occurred and prior to being brought to trial. The first conversation was testified to by Abe Dupler. He testified:

"Q: Okay, Now, how did the conversation start, or how did you become involved in it?

A: Sitting around the table, Joe and Ruth Reynolds were discussing obtaining a good attorney to defend Joe. So I said to Ruth, 'What is this all about?'

Q: And what was said?

A: And Joe spoke up and said, 'Well, I shot a man and I need a good attorney to defend me.'"

Later, when Ruth Reynolds was testifying, the following colloquy took place between the prosecutor and the witness:

"Q: Now, is there any other conversation that you recall between you and Joe Moya concerning this shooting?

A: Yes, Joe drove me to Sedona.

Q: When was that?

A: Beg your pardon?

Q: When was that?

A: That would be sometime during that week, probably Thursday or Friday of that week.

Q: All right.

A: I had lived in Sedona for a year. I wanted to go up and see some friends. He drove me to Sedona. On the way back he was talking about getting—, securing another attorney because he was going to be convicted because he shot the man.

\* \* \* \* \* \*

Q: I think your last answer was Joe said he was going to get convicted?

A: That's what he said to me.

Q: What else, if anything, did he say at this time?

A: Well, he was very concerned, and he wanted—he wanted help in getting out of the situation.

Q: And what kind of help?

A: Well, he asked for some financial help for a new attorney.

Q: And who did he request that financial help from, you?

A: From me.

Q: And how did he ask for help? What did he say?

A: Outright. He said he needed money to pay for another attorney."

The prosecutor in his final argument to the jury stated, inter alia:

"Remember, he told Ruth Reynolds that he was only guilty of second degree murder, because there was no premeditation. Now, in both statements to both Abe Dupler and in his statement to Ruth Reynolds, there was no mention of the word self defense.

Are we to believe, using our best powers of reasoning and logic, that a person sophisticated enough, and not naive enough to know the difference between premeditation and second degree murder? Would not know the more basic concept of self defense?

*Imagine yourself in the same situation as a defendant. You're talking to people and you want to get Ruth Reynolds to help you, assist you in paying for a [sic] attorney,* because you're dissatisfied with Mr. Babbitt. And you're talking to people about your crime, and you don't immediately say I shot a man, but I shot him in self defense.

Isn't that what you would say if you were in the similar circumstance? Isn't that what you would expect someone else to say, using your best powers of reasoning and logic? The absence of the statement by the defendant of the word self

defense is because he knew that he it didn't exist in this particular case.

Now you'll be instructed self defense is not available to one who is at fault in provoking the difficulty that resulted in the homicide. A person cannot sit up in his own defense and assess that he brought upon himself." (Emphasis added)

Citing *United States ex rel. Macon v. Yeager,* 476 F.2d 613 (3rd Cir.1973), cert. den. 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104, and *Zemina v. Solem,* 438 F.Supp. 455 (D.S.D.1977), aff'd 573 F.2d 1027 (8th Cir. 1978), appellant contends the admission of the evidence and the argument by counsel wrongfully penalized him for exercising his constitutional right to counsel. We do not agree.

In *Zemina,* a habeas corpus case, there was evidence that after a homicide the defendant called and spoke with his lawyer. In his final argument to the jury, the prosecutor stated that the petitioner's call to his lawyer was "a telling sign," the inference being that it was a "telling sign" of petitioner's guilt. In holding the prosecutor's statement to be prejudicial error the court stated:

"Similarly, comment on a defendant's exercise of his right to counsel could make the exercise costly, especially where it was never explained to the jury that the defendant had such a right, and a cautionary instruction that no inference of guilt should be drawn from exercise of that right was not given. The prosecution should not be allowed to imply that only guilty people contact their attorneys." 438 F.Supp. at 466.

In *United States ex rel. Macon v. Yeager,* supra, the prosecutor in his summation to the jury, stated:

"He goes home and puts the shirt down in the chest, a torn shirt. Then he goes to bed. He says he had trouble sleeping. He gets up the next morning and lo and behold, what does he do? He calls his lawyer. *These are acts of innocence?* (Emphasis added)" 476 F.2d at 514.

The court in *Macon* held that the comments by the prosecutor exacted a penalty for the exercise of the petitioner's constitutional rights and was prejudicial error.

In contrast to *Zemina* and *Macon* the evidence here did not consist solely of the exercise of one's right to an attorney. In other words, the evidence here did not consist of appellant exercising his right to call a lawyer. Rather, it consisted of an attempt by him to seek financial help to get a new attorney. In the process, he admitted the homicide but never said to anyone that he had acted in self-defense at the time. This is important, since even though appellant was not present at the trial, his attorney used the state's evidence to attempt to show he acted in self-defense.

Appellant next claims the prosecution was guilty of misconduct in calling a witness to the stand knowing that she would exercise her Fifth Amendment right not to testify. See *State v. Blankinship,* 127 Ariz. 507, 622 P.2d 66 (App.1980).[1] We do not agree. The state called Susan Schultz, who upon being sworn, stated: "For the record, at the preliminary hearing I was granted immunity and I want to make sure that it still held true for this trial." The prosecutor suggested that the court take up the matter in chambers and a recess was declared. In chambers the state explained that Mrs. Schultz had been given use immunity at the preliminary hearing. However, the state would not give her immunity at the trial because her testimony at the preliminary hearing did not indicate any involvement which could result in her prosecution. Mrs. Schultz then stated: "Well, I just feel that anything that I say could be held criminally against me." The trial court accepted this statement as invoking her Fifth Amendment right.

▮ If the state knows before trial that a witness will refuse to testify, then calling a witness for the purpose of raising inferences in a form not subject to cross-examination, can constitute prosecutorial mis-

1. See also Annot., 19 A.L.R. 4th 368 (1983).

conduct and may violate the confrontation clause of the Sixth Amendment in certain instances. *State v. Blankinship, supra.* Nothing in the record indicates that the prosecutor had prior knowledge that Mrs. Schultz did not intend to testify at trial. She appeared at trial under the false assumption that she would have immunity. When she discovered that immunity would not be granted, she refused to testify. There is no evidence in the record to indicate the state in any way contributed to Mrs. Schultz' misunderstanding of the immunity she had previously been granted. The state did not attempt to draw any inferences from the fact that Susan Schultz invoked her Fifth Amendment privilege; nor did the prosecutor ever mention such refusal to the jury.

Appellant next claims that the trial court erred in admitting two prior consistent statements of Judith Coffee. Det. Fuqua was permitted to offer testimony from his police report about what Judy Coffee had told him. The second instance also concerned Judy Coffee's statements to another police officer. Rule 801(d), Arizona Rules of Evidence, 17A A.R.S., provides in pertinent part, as follows:

"A statement is not hearsay if—
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . .

(B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, . . ."

Appellant's primary defense was one of self-defense. Appellant's counsel cross-examined Judy Coffee and the other investigating officers at length regarding statements by Mrs. Coffee concerning the sequence of events and her powers of observation, especially her first report of the incident as compared to subsequent reports. In addition, appellant also raised issues pertaining to a possible misidentification. The cross-examination was obviously intended to raise the inference that Judy Coffee had recently fabricated her trial testimony or had been improperly influenced by the police during their investigation of the crime. The prior statements were admitted to rebut this inference.

The last claimed error concerns the following instruction given to the jury without any objection by appellant:

"Now, one who merely does an act which affords an opportunity for conflict is not precluded from claiming self defense. The defendant's burden with respect to his plea of self defense extends no further than to raise in your mind a reasonable doubt as to whether his act was justified."

Appellant contends that the instruction wrongfully places upon him the burden of proving a reasonable doubt. We do not agree. The instruction merely concerns appellant's burden of proof on the self-defense issue and was proper. See *State v. Denny,* 119 Ariz. 131, 579 P.2d 1101 (1978); and *State v. Garcia,* 114 Ariz. 317, 560 P.2d 1224 (1977).

Affirmed.

HATHAWAY and BIRDSALL, JJ., concur.

NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120(E).