794 P.2d 1353

**STATE of Arizona, Appellee,**

v.

**Jimmie Lynn LUCAS, Appellant.**

**No. 1 CA–CR 89–954.**

Court of Appeals of Arizona,
Division 1, Department C.

June 7, 1990.

Robert K. Corbin, The Atty. Gen. by Jessica G. Funkhouser, Chief Counsel, Crim. Div., Phoenix, and Bruce Ferg, Asst. Atty. Gen., Tucson, for appellee.

John M. Antieau, Phoenix, for appellant.

## OPINION

EUBANK, Judge.

The supreme court has transferred its criminal appeal No. CR–87–0128 AP/PC to this court because our jurisdiction was expanded by the amendment of A.R.S. § 12–120.21 (Laws of 1989, ch. 58), which now includes life imprisonment appeals.

Following a lengthy jury trial, appellant was convicted of three counts of first-degree, felony-murder (A.R.S. § 13–1105) and one count of burglary (A.R.S. § 13–1508). He was sentenced to life imprisonment on the murder charges and ten years imprisonment on the burglary charge, with all counts to run concurrently.

The events which resulted in these charges being filed against appellant involved a shoot-out in an apartment in Phoenix. Appellant, with three of his companions, had entered the victim's apartment to confront him about problems which had occurred between the victim and one of appellant's companions. During the confrontation that ensued, appellant struck the victim in the side of the face with a .45 caliber automatic pistol that he was carrying. The weapon belonged to the appellant's companion, with whom the victim had been having a disagreement. After striking the victim in the face with the weapon, appellant began walking towards the front door of the apartment.

At about the same time, the victim's "common law" wife advised appellant that the police had been called and that he and the other people who had accompanied him should leave. When told this, appellant apparently looked over to his companion, stated that there was no use continuing to talk, fired and shot the victim, knocking him to the floor near the balcony of the apartment.

Appellant and one of his companions then immediately exited the apartment. However, before the other two companions could leave, the victim apparently got to his feet, walked back into the apartment and began firing at the individuals who were still there. The two individuals were killed. During the time the victim was firing his weapon, the appellant returned to the apartment, yelled to his companions to get out, and then fled to the parking lot where his truck was parked.

The appellant and his companion got into the truck and were leaving the parking lot as the first police officer arrived on the scene. The victim apparently climbed over his balcony and jumped into the parking lot where the appellant's truck was parked. The victim managed to get to the other side of the parking lot but collapsed and died on a cement parking block.

Appellant and his companion were captured approximately ten minutes later after being chased by the police from the scene. The .45 automatic which was used to shoot the victim was recovered along the route that appellant used to flee on foot from the police. He later made statements to the officer which conflicted with his trial testimony regarding how the shooting incident had occurred.

Two witnesses to the shooting, the victim's "common law" wife, Wanda Scurlock, and a neighbor, Donald Sandry, testified at trial. They were both in the apartment along with the victim, appellant and appellant's three companions. They were uninjured and testified about the incident at length. Appellant took the stand in his own behalf and testified. The jury convicted appellant, and he appeals from the judgment and sentences.

On appeal, appellant argues:

(1) His murder convictions are contrary to law and reason.

(2) Prosecution witnesses testified about alleged prior bad acts in violation of a pretrial order.

(3) Appellant was denied effective assistance of counsel when counsel allowed testimony of the prior bad acts to be brought before the jury.

(4) The trial court's handling of an alleged incident of juror misconduct denied appellant a fair trial.

(5) The trial court erred when it instructed the jury on justification defenses.

(6) Appellant was denied effective assistance of counsel through counsel's request for self-defense instructions.

(7) The trial court erred in refusing to give a *Willits* instruction.

(8) The trial court erred in its decision regarding a petition for post-conviction relief.

## CONVICTIONS FOR FELONY MURDER

Appellant argues that a charge of felony murder cannot be predicated on an assault. He argues that the assault is merged into the murder and may not be deemed a separate and independent offense which can support a conviction for felony murder. *State v. Essman*, 98 Ariz. 228, 235, 403 P.2d 540, 547 (1965); Note, *Felony–Murder and Merger in Arizona*, 17 Ariz.L.Rev. 791–804 (1975). Appellant concludes that the state has simply attempted to avoid that consequence by charging burglary as a predicate offense for felony murder. The state argues that appellant's argument has been expressly rejected. *See State v. Hankins*, 141 Ariz. 217, 221, 686 P.2d 740, 744 (1984); *State v. Miller*, 110 Ariz. 489, 520 P.2d 1113 (1974).

Arizona Revised Statutes § 13–1105(A)(2) states that a person commits first-degree murder if, while committing burglary or during immediate flight from such an offense, the person or another person causes the death of any person. Burglary is committed "by entering or remaining unlawfully in or on a residential structure with the intent to commit ... any felony therein." A.R.S. §§ 13–1507, –1508. Burglary is complete when entrance to the structure is made with the requisite criminal intent. *State v. Bottoni*, 131 Ariz. 574, 643 P.2d 19 (App.1982). Remaining unlawfully in a residence with the intent to commit assault constitutes burglary and satisfies the requirements of a felony murder charge. *State v. McGuire*, 131 Ariz. 93, 638 P.2d 1339 (1981).

While an assault which resulted in a death would not itself warrant a felony-murder charge, remaining unlawfully in a residence with the intent to commit an assault constitutes a burglary and, when a death occurs, may warrant a felony-murder charge. *State v. Hankins*, 141 Ariz. 217, 221, 686 P.2d 740, 744 (1984). The deaths of the victims, "Big Dee" and "Duke" clearly occurred either during the burglary or during immediate flight therefrom, and appellant was properly charged with their murders. *State v. Jimenez*, 130 Ariz. 138, 141, 634 P.2d 950, 953 (1981).

## TESTIMONY REGARDING PRIOR BAD ACTS

Appellant argues that during trial, several of the state's witnesses testified in violation of a pretrial ruling prohibiting reference to certain prior misconduct by him. Initially, appellant argues that testimony by Detective House, who related a portion of Wanda Scurlock's statement to him made the day of the shootings, constituted an improper reference to precluded matters. Appellant also argues that Officer Lazell's testimony regarding appellant's statements to him at the station house during his booking procedure violated the order. During a conversation with the officer, appellant asked the officer whether he wore a bullet-proof vest and told him that he wore one on his motorcycle rides in Texas because he never knew "what they were going to get into." Appellant also told the officer that he wasn't worried about his arrest that evening because he had been arrested before in Texas, and "his lawyer got him off on a self-defense charge, and he said his lawyer would get him off on a self-defense charge this time also."

Finally, appellant objects to two separate statements in closing arguments by the prosecutor that made reference to this last alleged statement to Officer Lazell. At the close of the first closing argument the prosecutor stated:

> There is an old adage there is nothing more dangerous than a wounded animal. What is more dangerous is someone who got away with murder. Jimmy Lucas boasted before. We should not let him boast again.

Finally, the prosecutor stated in the final closing argument:

> ... You come back in this courtroom and tell this defendant that the statement he made to Jeff Lazell that night, who testified in this courtroom: He seemed very calm at the time, and he said that he wasn't worried about the arrest that night, because he had been

arrested before, and the last time down in Texas he said his lawyer got him off on a self-defense, and he said his lawyer will get him off on a self-defense charge this time also. Please come back in this courtroom and don't ever allow this man to boast like that again.

Appellant suggests the first statement by the prosecutor insinuated that he had "gotten away with murder" and compounded the erroneous admission of the testimony regarding his statement that he had been arrested before and that his lawyer had "got him off on a self-defense charge...."

Appellant's counsel argues that the above testimony and the prosecutor's closing arguments violated the court's pretrial order prohibiting any reference to prior bad acts and denied the appellant a fair trial.

■ Prior to the commencement of trial, the defense filed a motion *in limine* arguing that no prior mention of bad acts should be made by the state, including Wanda Scurlock's statements, if any, that she was aware of appellant's reputation for violence. Such statements by Scurlock, according to appellant, would be based solely on hearsay. The motion was granted. Several weeks into the trial, Detective House testified in response to the following question by the state:

Q. What did she tell you after she described the meeting with Duke, Andy [sic] [and Dee] Humphries, and whether they were friends or not?

A. She said that during the time that she and Bill had known Dee Humphries, he had stated on several different occasions, that if Bill wanted someone killed, he was to contact Jimmy in Houston, Texas. She didn't know Jimmy's last name, but stated he was a white male, approximately, 46, 47 years of age.

Following the officer's testimony, defense counsel moved for a mistrial. The prosecutor avowed to the court that it was an unexpected answer.

■ The trial court denied the motion for mistrial. The testimony did not concern Wanda Scurlock's knowledge of the appellant's reputation for violence. Moreover, the witness's answer was unexpectedly volunteered and was clearly not solicited by the prosecutor. In such a situation, the proper response rests largely within the discretion of the trial court, which must decide whether a remedy short of a mistrial would cure the error. *State v. Rockwell*, 161 Ariz. 5, 775 P.2d 1069 (1989); *State v. Adamson*, 136 Ariz. 250, 262, 665 P.2d 972, 984 (1983), *cert. denied*, 464 U.S. 865, 104 S.Ct. 204, 78 L.Ed.2d 178. If the resulting prejudice makes it reasonably probable that the verdict would have been different, a mistrial may be an appropriate remedy. *State v. Grijalva*, 137 Ariz. 10, 14, 667 P.2d 1336, 1340 (1983).

Initially, we note that this was an isolated reference which occurred during a month long trial which was not emphasized in closing arguments or in any other way by the state. In addition, when this remark was made, Wanda Scurlock had already testified, as well as the Scurlock's neighbor, Donald Sandry, and both had related eyewitness accounts of the shooting. It does not appear that this isolated remark by the detective, although inappropriate, could have had such a substantial, prejudicial effect that a mistrial was the only remedy to preserve the appellant's right to a fair trial. It is unlikely that the jury would have chosen to believe this one isolated statement by Ms. Scurlock and rejected her other testimony. Because it does not appear reasonably possible that this statement could have materially influenced the jury, a mistrial was not warranted under the facts. *State v. Grijalva*, 137 Ariz. at 14, 667 P.2d at 1340.

Appellant also argues that officer Lazell's testimony about appellant's remarks during the booking process was improper. Although appellant suggests these remarks violated the judge's pretrial ruling on the motion *in limine*, it is clear to us that they did not. At the pretrial discussion regarding the admissibility of this evidence, defense counsel did argue these statements were not relevant to any issue in the case and should not be admitted.

The state argues the remarks concerning appellant's wearing of a bullet-proof vest on motorcycle rides was relevant to the case as proof of a state of mind, i.e., intent or absence of mistake or accident.

■ Evidence is relevant if it has any tendency to make the existence of a disputed fact more or less probable. Rule 401, Arizona Rules of Evidence. The state argues that, given the wide discretion a judge has in determining the admissibility of evidence and the fact that appellant's state of mind was the crux of the state's case, it was not an abuse of discretion to admit the statement. *State v. Rose*, 121 Ariz. 131, 136, 589 P.2d 5, 10 (1978). However, we find that appellant's statement that he previously wore a bullet-proof vest in Texas because he never knew "what they were going to get into" was not relevant to any issue in this case.

■ There was no contention that appellant was wearing a bullet-proof vest at the time the shooting occurred or that the prior statement made any issue in this case more or less probable. It appears the sole purpose of the evidence was to show appellant's violent character by his wearing a bullet-proof vest and that the state wished the jury to infer in this case that appellant had simply acted in conformity with his violent character. When evidence is offered simply to show that a person acted in conformity with his aggressive and violent character, it is not admissible as a trait of character. *State v. Superior Court*, 132 Ariz. 374, 645 P.2d 1288 (App.1982). However, the state argues that even assuming the statement was erroneously admitted, it was harmless under the circumstances. The record supports such a position.

There could have been little doubt in any of the jurors' minds at the end of the trial that all of the individuals involved in this case were associated with "biker" groups. At various times throughout the trial, the jurors were aware that some of the victims had been associated with a "Veteran's" biker group, that one of the victims had allegedly stolen a motorcycle from the Dirty Dozen bikers' club, and that Donald Sandry was involved with either the Hell's Angels or another motorcycle club. Defense counsel cross-examined Donald Sandry suggesting that Sandry had painted this entire incident as a "biker" war. It appears from the record that any harm that could have resulted from the jurors becoming aware that appellant had previously worn a bullet-proof vest while riding with a motorcycle club in Texas was harmless beyond a reasonable doubt.

■ The second comment testified to by Officer Lazell concerned appellant's statement that he had been arrested before, but that "his lawyer got him off on a self-defense charge, and he said his lawyer would get him off on a self-defense charge this time also." In his opening brief, appellant does not explain why the admission of this statement was erroneous other than to argue the fact that it allegedly violated the pretrial ruling by the trial court. The admission of this statement did not violate the pretrial ruling. However, appellant does make a broad allegation that the admission of this statement and its use in the closing arguments by the prosecutors denied him a fair trial. He argues that the testimony, coupled with the prosecutor's arguments, called the jury's attention to matters that could not properly be considered in determining their verdicts. The state argues that the statement was a tacit admission of guilt because appellant's words implied the defense was fabricated.

In a similar situation, *State v. Ferguson*, 149 Ariz. 200, 717 P.2d 879 (1986), a defendant who was aware that he was being charged with first-degree murder voluntarily stated that he was going to plead insanity because, "it was the only way out. I have got to try it." The court found that such a statement indicated a consciousness of guilt and was a fact which the jury could consider as raising an inference that the defendant was guilty. Similarly, in *State v. Parris*, 144 Ariz. 219, 696 P.2d 1368 (1985), the court found that a defendant's inquiry to third parties regarding the necessity of hiring an attorney to defend him was admissible on the issue of identity. In *State v. Moya*, 138 Ariz. 7, 11, 672 P.2d 959, 963 (App.1983), the court found that

evidence that a defendant had attempted to obtain financial help to hire an attorney "because he was going to be convicted because he shot the man," was admissible where the defendant raised the defense of self-defense. The court found that his conversations with the witnesses, in which he attempted to solicit support to hire an attorney and failed to mention that he had committed the act in self-defense, were admissible as evidence supporting the inference that he had not committed the act in self-defense. *Id.*

While the statements in this case may come close to being characterized as penalizing the appellant for exercising his constitutional right to counsel, a fair reading of the record demonstrates that the statements were not to the effect that appellant had committed the act in self-defense and needed a lawyer to protect his rights, but were rather statements that he would "get off" on a self-defense plea. This statement was particularly relevant in view of the fact appellant had fled from the scene, attempted to escape on foot from police officers who pursued him, and that he initially told Detective House that he and his companion, Steve, did not go up to the victim's apartment until after they had heard gunshots.

Thus, given appellant's initial statements to Detective House shortly after his arrest, the statement was relevant and properly considered by the jury as evidence that the defense of self-defense was fabricated and indicated a consciousness of guilt. *Cf., State v. Ferguson, supra; State v. Moya, supra.* The statement was properly admitted.

Finally, appellant argues the remarks made by the prosecutors during closing argument were improper. He argues the statements referred to above suggested to the jury that the appellant had previously "gotten away with murder." No objection was made to these statements during trial. Normally, opposing counsel must timely object to erroneous or improper statements made during closing arguments or waive the right to object to them on appeal. *State v. Smith,* 138 Ariz. 79, 83, 673 P.2d 17, 21 (1983). This court will only consider those unobjected to comments, which are made during closing argument, which rise to the level of fundamental error. *State v. Denny,* 119 Ariz. 131, 134, 579 P.2d 1101, 1104 (1978).

We agree with the state that the first comment referred to is somewhat ambiguous and does not necessarily suggest that appellant previously "got away" with murder. It clearly could have suggested to the jury that appellant was fabricating his defense of self-defense and that if the jury accepted it, it would be permitting him to now get away with murder. The same conclusion may be reached with respect to the second statement made by the prosecutor.

As noted in *Donnelly v. De Christoforo,* 416 U.S. 637, 646–47, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431, 439 (1974):

[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

Moreover, a prosecutor may refer to a defendant as a murderer if the evidence at trial reasonably supports such a description. *State v. McDaniel,* 136 Ariz. 188, 197, 665 P.2d 70, 79 (1983). Not all emotional appeals by the prosecutor during closing arguments are condemned. *State v. Garrison,* 120 Ariz. 255, 257, 585 P.2d 563, 565 (1978). An emotional appeal which constitutes a permissible inference drawn from the nature of the evidence presented to the jury does not unfairly prejudice a defendant. *Id.*

In this case, the prosecutor's arguments, occurring after a month-long jury trial, in which the jurors had been instructed that the prosecutor's arguments were not evidence, did not, in our opinion, rise to the level of fundamental error.

### INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant argues that to the extent the improper testimony concerning prior bad

acts was admitted by defense counsel's failure to renew his motion *in limine* and preserve the court's favorable pretrial rulings, he was denied effective assistance of counsel. Appellant also argued in the motion for rehearing on his petition for post-conviction relief that he was denied effective assistance of counsel. He argued that after defense counsel obtained favorable pretrial rulings excluding any reference to prior bad acts, he examined witnesses at trial in a manner which tended to bring out appellant's possible bad reputation. He also argued that defense counsel allowed police officers to testify to the statements discussed above, "which was clearly in violation of the court's pretrial rulings."

To demonstrate ineffective assistance of counsel, appellant must satisfy a two-prong test. First, he must show that under the circumstances, his counsel's actions were unreasonable under prevailing professional norms. *State v. Nash*, 143 Ariz. 392, 397, 694 P.2d 222, 227 (1985), *cert. denied*, 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985). Second, there must be a reasonable probability that, absent counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* 143 Ariz. at 398, 694 P.2d at 228; *State v. Lee*, 142 Ariz. 210, 219, 689 P.2d 153, 162 (1984). The court need not approach the inquiry in a specific order or address both prongs of the inquiry if the defendant makes an insufficient showing of either one. *State v. Salazar*, 146 Ariz. 540, 541, 707 P.2d 944, 945 (1985).

Actions of defense counsel which appear to be trial tactics will not support an allegation of ineffective assistance of counsel. *State v. Espinoza–Gamez*, 139 Ariz. 415, 417, 678 P.2d 1379, 1381 (1984). Courts presume that counsel's conduct is trial strategy. *State v. Fisher*, 152 Ariz. 116, 118, 730 P.2d 825, 827 (1986), *citing Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674, 694–95 (1984).

Appellant's argument that defense counsel's failure to renew his motion *in limine* and preserve the court's favorable pretrial rulings constituted ineffective assistance of counsel is without merit. Defense counsel was not required to renew the motion *in limine* through additional objections at trial in order to preserve the issue for review on appeal. *State v. Williams*, 133 Ariz. 220, 224, 650 P.2d 1202, 1206 (1982).

In his opening brief, counsel does not articulate the "improper testimony" to which he refers. However, in the petition for post-conviction relief, he argued that counsel: (1) "examined witnesses as though those pretrial rulings had never been made" (i.e., defense counsel "repeatedly referred to his own client as 'the muscle imported from Texas'"); (2) "allowed" police officers to testify about appellant's statements regarding the wearing of bullet-proof vests and previous acquittals on self-defense; and (3) permitted the jury to learn that appellant was employed by the attorney who was defending him in this case.

As noted above, the officer's testimony regarding the bullet-proof vest, although not relevant to any issue in the case, was harmless. Therefore, appellant has failed to demonstrate that his case was prejudiced by counsel's conduct and his claim of ineffective assistance of counsel on this ground fails. *State v. Nash*, 143 Ariz. 392, 694 P.2d 222 (1985). Furthermore, the testimony suggesting appellant's fabrication of the self-defense issue was properly admitted at trial. Finally, appellant's counsel on appeal takes issue with the strategy utilized by trial counsel in referring to his client as "the muscle imported from Texas."

The portion of the examination from which that reference was taken clearly suggests the method of examination was a tactical decision. The purpose of the examination appears to have been to show that the victim and Sandry visited Big Dee's home several days prior to the shooting and they sat outside the home for over two hours in their truck without feeling threatened by appellant while they waited for a friend. He also got Sandry to admit that, on the night of the shooting, the vic-

tim had not immediately attempted to draw his weapon when the appellant allegedly kicked his apartment door in and came in with a weapon drawn. It appears the inference counsel sought to have the jury draw was that appellant was not the dangerous person the state was attempting to portray. In other words, his point was that the victim did not demonstrate the concern or intimidation that might have been expected if the appellant were truly "the muscle imported from Texas." That appellate counsel disagrees with the strategy or claims error in the trial tactics chosen is not enough to support a finding that the trial lawyer's conduct was ineffective. *State v. Oppenheimer*, 138 Ariz. 120, 123, 673 P.2d 318, 321 (App.1983).

In view of the evidence, including the presence of two eyewitnesses, appellant's flight from the scene, conflicting statements after arrest, and his attempt to elude the police and conceal the weapon, the defense faced a difficult task at trial. Counsels' conduct did not result in the failure to preserve favorable pretrial rulings, and their performance at trial was consonant with the sixth amendment standards pertaining to effective assistance of counsel.

### ALLEGED JUROR MISCONDUCT

█ During trial, a letter was presented to the trial judge from one of the jurors, who complained about the actions of another juror's wife. After receiving the letter, the court called the complaining juror into chambers and spoke to her about it. She told the judge the letter had been shown to several other jurors. The juror also told the judge that it appeared to several of the jurors that the juror's wife, who had been attending the trial almost every day, had been acting inappropriately by obviously sympathizing with members of the appellant's family who were also attending the trial. She also told the judge the juror's wife tried to explain to them why breaks were being taken during trial. She also explained other trial matters the juror's wife had tried to talk about. Other jurors who were examined by the court also con-

firmed that this person had attempted to talk to them about the evidence and about delays that had occurred during trial. After the complaining juror advised the court that she could still act fairly and give a decision based on the evidence, all of the other jurors were examined in chambers by the judge.

After all of the jurors were examined, the court called the juror whose wife was at the center of the controversy into chambers. This juror admitted that he had been discussing trial testimony with his wife and acknowledged to the judge that he had been aware of the admonition not to do so but had violated it anyway. The judge then excused this juror and advised the remaining jurors that they were not to speculate about the reasons for the court's action in excusing the juror.

All of the jurors who had been called into chambers and examined by the court and counsel told the court the "letter" incident would not affect them and that they could still continue to judge the case on the evidence that was presented to them. Although appellant concedes that the one juror improperly discussed trial testimony with his wife and that the court was justified in excluding him from deliberating on the case, he argues that the manner in which the trial court handled the situation denied him a fair trial. He argues that the judge should have explained to the other jurors that the one juror was dismissed because he had discussed the testimony with his wife. Appellant concludes that the other jurors, not knowing the reason, might have drawn the conclusion that anyone sympathizing with the defense would be removed from the jury.

In reviewing the entire record in this matter, it is clear the court properly determined that each of the jurors, except the one dismissed, could render a fair and impartial verdict. A clear showing of an abuse of that discretion is required before the trial judge's determination will be reversed on appeal. *State v. Rose*, 121 Ariz. 131, 139, 589 P.2d 5, 13 (1978). Furthermore, it cannot be presumed that the jurors violated the judge's admonition not to spec-

ulate about the reasons for the juror's removal. *State v. Trujillo*, 120 Ariz. 527, 531, 587 P.2d 246, 250 (1978).

Appellant has failed to establish that any of the jurors were incapable of rendering a fair and impartial verdict. To the contrary, each assured the court that they were capable of doing so even after the matter arose and they were made aware that a letter had been presented to the court detailing a concern about the sympathy of the juror's wife to the appellant's family. Moreover, some of the jurors told the court they were unaware of the possible displays of sympathy and yet others told the judge that the juror's wife had attempted to talk to them about the case, including the evidence and the reasons for delays that were occurring during the trial. We cannot say that the trial court's determination and manner in which it excused one juror prevented the jury from rendering a fair and impartial verdict.

### INSTRUCTIONS ON JUSTIFICATION

Appellant argues that the justification instructions given to the jury were erroneous and could have misled the jury into considering that the victim's use of deadly force was a justified response to appellant's use of non-deadly force.

■ The trial court instructed the jury pursuant to A.R.S. § 13–405. However, it erroneously advised them that a person is justified in threatening or using deadly physical force against another person when a reasonable person would believe that deadly physical force was immediately necessary to protect that person against the other's use or attempted use of "unlawful physical force," rather than the other's use or attempted use of "unlawful *deadly* physical force." The judge also instructed the jurors when the use of deadly physical force was not justified as set forth in A.R.S. § 13–404(B)(1), (3). The judge also instructed the jurors on the justification defense set forth in A.R.S. § 13–411. In accordance with that statute, he instructed the jurors on the lack of a duty to retreat and the presumption that a person is acting reasonably in using deadly force when he is

acting to prevent the commission of murder, burglary, or aggravated assault.

Thereafter, the court defined "aggravated assault" as occurring when a serious physical injury results or when a deadly weapon is used. The court further instructed the jurors that "aggravated assault" could include those assaults which occur after entering the residence of another with the intent to commit an assault.

Appellant argues that A.R.S. § 13–411(A) does not permit deadly physical force to be used to prevent the commission of a burglary or an assault unless they involve a deadly weapon or where serious physical injury occurs. A.R.S. § 13–411 does require that aggravated assault be accomplished through either the infliction of serious physical injury or the use of a deadly weapon. Therefore, to the extent the instructions may be construed as advising the jurors that an aggravated assault could include *any* assault which occurs after entering the residence, it was erroneous.

■ Appellant argues that it was fundamental error for the court to give the jury any instructions concerning justification because there was no issue of premeditation and there can be no claim of self-defense to a charge of felony murder. *State v. Celaya*, 135 Ariz. 248, 660 P.2d 849 (1983). However, appellant agrees that the justification instructions given to the jury were directed to the shooting and not to the underlying assault or burglary charge. Appellant argues, however, that because the instructions were given, and were in part erroneous, they invited the jury to conclude that the victim's use of deadly physical force was justified when the statutes do not so provide. Appellant asserts these instructions constituted fundamental error because no objection was ever made to them. Not only were they not objected to, it appears they were offered by the defense, which, as a matter of strategy, had pursued its case on a theory of self-defense.

However, appellant's argument misses the point. Whether or not the victim's use

of deadly force was justified was simply not an issue in the case. The only issues properly before the jury were whether a burglary occurred and whether during the commission of that offense or during the immediate flight therefrom, a person caused the death of any other person. Whether the victim's conduct in shooting "Big Dee" and "Duke" was justified was not an issue and was not argued at trial. The degree of the force necessary to prevent the assault or burglary was never an issue at trial, only whether the appellant acted in self-defense or was the aggressor.

 When a defendant does not object to an instruction, any error is waived unless the instruction constitutes fundamental error. *State v. Grilz,* 136 Ariz. 450, 454, 666 P.2d 1059, 1063 (1983). Not only were there no objections to these instructions, but the defense requested them. Under those circumstances, it is a rare case in which counsel will be able to argue on appeal that the instructions nevertheless constituted fundamental, reversible error. *See State v. Taylor,* 109 Ariz. 481, 483, 512 P.2d 590, 592 (1973). It is clear the instructions did not deprive the appellant of "a right essential to his defense." *State v. Grilz,* 136 Ariz. at 454, 666 P.2d at 1063. Under the facts of this case, the self-defense instructions could only have benefited the appellant by providing counsel with an argument that should not have been available. *See State v. Celaya,* 135 Ariz. 248, 660 P.2d 849 (1983). Self-defense simply does not apply in a felony murder case.

Under the facts, it appears that the justification instructions requested by defense counsel did not constitute fundamental reversible error. *See, e.g., State v. Jackson,* 511 S.W.2d 771 (Mo.1974); *People v. Crandell,* 46 Cal.3d 833, 760 P.2d 423, 251 Cal. Rptr. 227 (1988) (a review of all the evidence introduced at trial demonstrated that the jury clearly rejected the defendant's claim of self-defense). Here, the jury was properly instructed that appellant could be convicted of felony murder if they found that he had committed burglary by entering or remaining unlawfully in a residential structure with the intent to commit *any*

felony while armed with a deadly weapon. *State v. Hankins,* 141 Ariz. 217, 686 P.2d 740 (1984). There was no issue in this case as to whether or not appellant had entered the apartment with a weapon or that serious physical injury was caused to the victim. The only issue was whether or not the appellant had *entered* the apartment with the intent to commit assault. Under those circumstances, there is no reasonable likelihood that the jurors could have been confused or misled by the instructions given to them by the court on justification. *Cf., State v. Avila,* 147 Ariz. 330, 338, 710 P.2d 440, 448 (1985) (when an element of a crime is not at issue, a failure to instruct on it is harmless).

## INEFFECTIVE ASSISTANCE OF COUNSEL

The standard of review involving a claim of ineffective assistance of counsel is set out above. Appellant argues that to the extent improper instructions regarding justification were requested by the defense, appellant was denied effective assistance of counsel. Although appellant suggests in his opening brief that this claim was the subject of a petition for post-conviction relief, it was not an issue raised in the motion for rehearing.

 Matters of trial strategy will not support a claim of ineffective assistance of counsel, provided the challenged conduct had some reasoned basis. *State v. Nirschel,* 155 Ariz. 206, 208, 745 P.2d 953, 955 (1987); *State v. Oppenheimer,* 138 Ariz. 120, 673 P.2d 318 (App.1983). As counsel admitted in the motion to vacate judgment, the strategy of the defense was, from the outset, to present a self-defense defense to the jury. Other than that defense, appellant's only other available defense was that he did not have the intent to commit a felony when he entered the victim's apartment.

It is clear from the record that defense counsel determined early on to pursue a self-defense defense at trial, and it is also clear their choice was one of strategy. Therefore, appellant's claim of ineffective assistance of counsel must fail. *Id.* That

appellate counsel now disagrees with the strategy pursued simply is not enough to support a finding that trial counsel's conduct was incompetent. There was a demonstrable and reasoned basis for all of the choices made by trial counsel, one of whom was an experienced Arizona trial attorney. While co-counsel may have been from Texas, there is nothing in the record to suggest or support an inference that pursuit of the self-defense defense was an uninformed choice of counsel.

## WILLITS INSTRUCTION

Counsel's final argument in his direct appeal challenges the trial court's refusal to give a *Willits* instruction based on the alleged destruction or non-preservation of certain evidence at the crime scene. He refers to testimony that the victim's door was kicked in, that there was blood on the balcony outside the apartment, and that a bloody fingerprint appeared in exhibit 41. His motion for new trial listed eight separate examples of failure to collect and/or preserve evidence. He argues the trial court erred by failing to give an instruction on the inferences to be drawn by the jury where the destruction of evidence has occurred. *State v. Willits*, 96 Ariz. 184, 393 P.2d 274 (1964).

In *State v. Perez*, 141 Ariz. 459, 464, 687 P.2d 1214, 1219 (1984), the court held that where the state failed to act in a timely manner to insure the preservation of evidence that was obviously material and reasonably accessible, a defendant was entitled to a *Willits* instruction after showing he was prejudiced by the loss of the evidence. *Id.* The court explained that where the state failed to obtain obviously material evidence, the defendant must show actual prejudice before he could claim entitlement to a *Willits* instruction. Finally, the court stated that the trial court's decision to give or forego a *Willits* instruction would not be reversed absent a clear abuse of discretion. *Id.*

We review the three claims of error which appellant argues supported the giving of a *Willits* instruction in this case.[1] Although the state made no effort to preserve evidence that the victim's apartment door may have showed signs of being "jimmied" or to collect fingerprints from the doorknob, or to take a sample of the blood on the balcony, or to discover the print allegedly appearing on the inside of the trigger guard on the .38 caliber handgun found next to the victim "Duke" in the kitchen, the court was not required to give a *Willits* instruction under the facts of this case.

Appellant claims that physical evidence showing the doorjam had not been broken or damaged and that his fingerprints were on the doorknob would have supported his argument that he had not "kicked in" the apartment door as alleged in some of the testimony introduced at trial. However, the offense of burglary can be committed by unlawfully remaining on the premises with the intent to commit a felony, including assault. Here, the evidence was uncontradicted that appellant was on the property with a handgun in his possession. The eyewitnesses testified that he struck the victim in the side of the head with the .45 before leaving the apartment. The evidence at trial supported an inference that appellant had the intention to assault the victim before he ever arrived at the victim's apartment and had not been invited into it. The collection of this evidence was not "obviously material," and appellant has failed to make any showing that he was prejudiced by the state's failure to act in a timely manner to preserve such evidence.

The same analysis applies to the appellant's allegation that the failure to preserve blood samples from the balcony prejudiced him. Appellant's own testimony at trial corroborated the eyewitness testimony that the victim, after being shot, staggered onto the balcony. Appellant has failed to show

---

1. Appellant's failure to set forth any of the other claimed grounds supporting the giving of a *Willits* instruction in the opening brief constitutes a waiver. *State v. Nirschel*, 155 Ariz. 206, 208, 745 P.2d 953, 955 (1987). However, to the extent those allegations of error could be considered as raisable on appeal, our resolution of the three specific points raised is equally applicable to the other allegations of failure to preserve evidence.

actual prejudice by the state's failure to collect or preserve any of the blood samples from the balcony.

Finally, the state and defense only became aware of the existence of a possible bloody fingerprint inside exhibit 41 at the time of trial. Appellant's counsel had the same opportunity as the state to determine the existence of the fingerprint at a much earlier stage. In any event, although appellant suggested at trial that perhaps the victim's neighbor, Donald Sandry, had somehow sneaked into the kitchen and planted the weapon on "Duke," he failed to show that he was actually prejudiced by the state's failure to preserve the evidence of the apparent bloody fingerprint, and he additionally failed to show the state should have recognized this evidence was "obviously material."

In view of the eyewitness testimony, the other facts referred to above with respect to this incident, and appellant's own inconsistent stories, it is clear the state cannot be faulted for determining that this was not "obviously material" evidence and preserving it. The trial court's decision to refuse the giving of a *Willits* instruction in this case was not an abuse of discretion.

## PETITION FOR
## POST–CONVICTION RELIEF

In the motion for rehearing filed from the denial of post-conviction relief, appellant argued several bases for a finding that he was denied effective assistance of counsel: (1) counsel's failure to preserve favorable pretrial rulings; (2) improper examination of witnesses resulted in appellant's reputation being placed before the jurors; (3) that counsel allowed police officers to repeat appellant's statements about wearing bullet-proof vests when he went on motorcycle rides in Texas; and (4) that counsel allowed a police officer to repeat his statement that he had previously been acquitted on a self-defense theory in Texas. These claims have been discussed above and further discussion of them is not necessary.

Additionally, appellant argued that counsel was ineffective because he failed to call potential defense witnesses at trial whose testimony would have supported "one or more defense theories." He suggests counsel was ineffective for failing to call appellant's daughter, Angela Garland, and Linda Humphries as potential witnesses at trial. A supplemental motion for rehearing was filed in which counsel stated that one of the basic claims, i.e., that his trial counsel was ineffective for failing to subpoena witnesses in support of any coherent defense theory, was supported by the documents attached thereto. The documents attached were affidavits from appellant and an investigator. In a second supplemental motion for rehearing, appellant again argued that trial counsel's failure to call witnesses, including his daughter, was ineffective because she could have explained his non-criminal reason for being in Phoenix.

Disagreements in trial tactics will not support a claim of ineffective assistance of counsel provided the conduct had some reasoned basis. *State v. Lee,* 142 Ariz. 210, 214, 689 P.2d 153, 157 (1984). A defendant's sixth amendment right to present a defense does not include the right to determine what witnesses will be called at trial. *Id.* Here, trial counsel may have determined that it would not be appropriate to call the appellant's young daughter to testify at trial. Appellant testified that he and his daughters were here in Phoenix to allow the daughters to visit their mother—without mentioning she was incarcerated in a women's prison. Trial counsel may well have determined that the potential danger of having that information come out inadvertently through the daughter's testimony was not worth the risk of her testifying. In any event, the weight of her testimony may have been such that defense counsel decided that it was not worth the risk of having her testify because the jurors would not have given any more credibility to her testimony than to her father's or other witnesses who testified on his behalf. There were several witnesses who testified for the appellant, including Paul Flagg and "Big Dee's" son.

**554**

Appellant does not explain how either Linda Humphries' or Angela Garland's testimony would have changed the outcome of this trial. The only evidence of what Garland would have testified to was that she had seen two individuals jump off the third floor of the apartment complex directly across from her residence, which presumably was the victim's apartment complex. There was no other evidence to support or corroborate her testimony, and defense counsel cannot be faulted for failing to present it at trial. Finally, appellate counsel suggests that trial counsel was ineffective in failing to call "Big Dee's" wife, Linda Humphries, to testify at trial. Again, it is unclear what testimony she would have provided. Paul Flagg, who was in the parking lot with her at the time the shooting occurred, testified that he was with Linda Humphries and that "Big Dee" had given them the keys to his truck and told Linda to leave in the event anything "went down."

In order to succeed on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was professionally defective and that the defense was thereby prejudiced. *State v. Nash*, 143 Ariz. 392, 694 P.2d 222 (1985). The arguments preserved in the motion for rehearing prove neither of these elements. Although appellant's daughter's testimony or Linda Humphries' testimony may have added some slight weight to the defense case, it does not appear that it would have had any substantial weight and certainly cannot be said to have affected the outcome of appellant's trial. The failure to call witness Garland, under the facts as set forth in this record, was clearly a proper strategic choice by counsel, as was the choice not to call either appellant's daughter or Linda Humphries.

The judgment and sentences are affirmed.

GERBER, Judge, specially concurring.

I write specially to address what for me are troublesome due process issues in the two felony murder convictions. This case demonstrates why the felony murder rule has generated what the commentary to Hawaii § 707–701 terms "an extensive history of thoughtful condemnation." The essence of the problem is that the felony murder doctrine creates a strict liability crime because the mental state for felony murder is mandatorily presumed from evidence of the mental state of the predicate felony, burglary in this case. In this unique area where the stakes are as high as a death penalty or life imprisonment, A.R.S. § 13–1105(B) both denies the relevance of the defendant's actual mental state and, in its place, presumes a mental state sufficient for felony-murder from the commission of a crime less severe than homicide. Elsewhere we have learned not to indulge similar mandatory presumptions; *See State v. Forrester*, 134 Ariz. 444, 657 P.2d 432 (App.1982).

We first learned the felony murder rule from England. It arose at a time in that country when all felonies were punishable by death. Whether someone hanged for the felony or the murder made little difference. The rule may have made some minimal sense in a legal system which did not recognize the tort of wrongful death. Modern England abolished the rule without lament in 1957, more than thirty years ago. Well before abolition, English scholars were unanimous in condemning it for violating the bedrock principles of our criminal law, specifically the otherwise universal requirement to establish homicidal mental state for a homicide conviction. In 1834 His Majesty's Commissioners on Criminal Law found the felony murder rule "totally incongruous with the principles of our jurisprudence." *First Report of His Majesty's Commissioners on Criminal Law* 29 (1834). Sir James Stephens found the rule a "monstrous doctrine." 3 Stephens, *History of the Criminal Law of England* 75 (1883).

Modern commentators have almost uniformly denounced the rule and its illusory deterrence value. The American Law Institute's *Model Penal Code and Commentary*, Pt. II, at 37–39, comment to section 210.2 (1980), on which our criminal code heavily relies, generally recommends abolition of felony murder. G. Fletcher's *Reth-*

*inking the Criminal Law* (1978) denounces the rule as "fictitious" and "violative of equal protection." The rule has been abolished not only in England but also in India and severely restricted in Canada and in most other Commonwealth countries. It does not exist in Europe. *See Model Penal Code,* Sec. 210.2, 39–40 (1980). Where it does exist, the rule is regularly the subject of scholarly ridicule, e.g., Note, "Felony–Murder: A Tort Law Reconceptualization," 99 Harv.L.R. 1918 (1986) (less protection than accorded wrongful death tort defendants); Roth and Sundby, "The Felony Murder Rule: A Doctrine at Constitutional Crossroads," 70 Cornell L.R. 446 (1985) (unconstitutional mandatory presumptions); Note, "Should Courts Use Principles of Justification and Excuse to Impose Felony–Murder Liability?", 19 Rutgers L.J. 451 (1985) ("... Russian roulette ... cannot engender widespread public confidence".)

Where the rule survives, the interpretive trend is to narrow its application. Legislatively, the rule has been limited in enlightened states in varied ways—by restricting its application to specified felonies, by requiring a stricter interpretation of causation, by limiting the applicable time period, or by requiring that the underlying felony be independent of the homicide. *See* LaFave and Scott, *Substantive Criminal Law,* 206–234 (2nd edition, 1986). Other states have abolished the rule entirely either by judicial fiat or by statute. *See e.g.,* Ky.Rev.Stat.Ann. § 507.020; Hawaii Rev. Stat. §§ 707–701; *People v. Aaron,* 409 Mich. 672, 299 N.W.2d 304 (1980) (calling the rule "unjust" and "fundamentally unfair"). Other courts have candidly admitted that the rule serves no deterrent function. *Commonwealth ex rel. Smith v. Myers,* 438 Pa. 218, 226–27, 261 A.2d 550, 554–55 (1970).

One of the most common limitations placed on the rule is to preclude homicide liability when the felony-murder killing is done by the victim, as occurred here. *See e.g., Commonwealth v. Balliro,* 349 Mass. 505, 209 N.E.2d 308 (1965); *Commonwealth v. Redline,* 391 Pa. 486, 137 A.2d 472 (1958); *People v. Washington,* 62 Cal.2d 777, 44 Cal.Rptr. 442, 402 P.2d 130

(1965); *Weick v. State,* 420 A.2d 159 (Del. 1980); *State v. Crane,* 247 Ga. 779, 279 S.E.2d 695 (1981). These results acknowledge that the rule cannot deter felons by holding them responsible for actions not under their control. To impose on all felons an additional penalty for a killing initiated by a victim punishes felons solely for the unpredictable response over which the felon has no control. The rule cannot possibly deter this type of killing. As to acting with reckless indifference to foreseeable death, that kind of homicidal culpability is already adequately covered by the existing provisions of second degree murder under A.R.S. § 13–1104, thus making felony-murder coverage unnecessary and redundant.

These observations are prompted not by sympathy for homicidal felons but by a quest for a law that generates respect, one which, in a word, does not sacrifice principle to crime-fighting rhetoric. The social sciences are learning, slowly, that people do not obey the law out of self-interest nor from fear of punishment but instead from recognition of its fairness. T. Tyler, *Why People Obey the Law* (Yale, 1990). Though I have these and other serious hesitations about both the wisdom and the dubious due process aspects of this expansive use of a rule progressively being eliminated or narrowed in principled jurisdictions, I am reminded that my role is to be neither legislator nor evaluator of its wisdom and that my thoughts generally should be confined to those raised by appellate counsel. The due process issues, at least for me, need to await knowledgeable articulation at both the trial and appellate level, neither of which has occurred here.

FIDEL, Judge, specially concurring:

I join in the majority decision, but add these comments in response to Judge Gerber, who raises issues in concurrence that were neither argued in the trial court nor on appeal. I limit my comments to the subject of culpable mental state.

A.R.S. § 13–1105(B) provides that felony murder "requires no specific mental state other than what is required for the commis-

sion of [the underlying felony]". Though Judge Gerber criticizes this provision, our supreme court has upheld its constitutionality. *State v. McLoughlin*, 139 Ariz. 481, 485–86, 679 P.2d 504, 508–09 (1984).

Three years later, however, the U.S. Supreme Court pointedly defined the subjective culpability at the heart of the felony murder rule—not in terms of the underlying felony alone, but in terms of indifference to a foreseeable risk of death. The Court stated:

> Participants in violent felonies like armed robberies can frequently 'anticipate that lethal force ... might be used ... in accomplishing the underlying felony.' ... Indeed, the possibility of bloodshed is inherent in the commission of any violent felony and this possibility is generally foreseeable and foreseen; it is one principal reason that felons arm themselves.

*Tison v. Arizona*, 481 U.S. 137, 150–51, 107 S.Ct. 1676, 1684–85, 95 L.Ed.2d 127 (1987).

According to *Tison*, the Constitution permits capital punishment for felony murder despite the absence of intent to kill if a sufficiently culpable level of indifference is proven. The Court stated:

> [W]e hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

481 U.S. at 157–58, 107 S.Ct. at 1688–89.

In *State v. Marchesano*, our court described *Tison* as setting "essentially a 'conscious indifference' standard" for capital felony murder cases. 162 Ariz. 308, 315, 783 P.2d 247, 254 (App.1989). We went on to hold the lesser standard of reasonable foreseeability sufficient to support a felon's non-capital sentence for a killing or attempted killing by an accomplice. *Id. Marchesano* suggests by implication that reasonable foreseeability is likewise sufficient to support a non-capital sentence for felony murder. Under either a conscious indifference or reasonable foreseeability

standard, however, these authorities suggest that culpable mental state with respect to the *murder*—not just the underlying felony—must be shown.

If this analysis is valid, the constitutionality of A.R.S. § 13–1105(B) is suspect. Although our supreme court upheld that statute in *McLoughlin*, it did so without addressing questions of foreseeability or indifference. These questions have come into sharper focus after *Tison*.

Even if *McLoughlin* is ripe for reconsideration, however, and even if foreseeability or conscious indifference should be recognized as a necessary element of felony murder, I see no fundamental, reversible error in the present case. Both foreseeability *and* indifference were abundantly proven in this record.

Defendant came armed for a violent encounter. At least one of his three companions came armed as well. The victim was conspicuously armed with a gun and holster. Defendant fired first and shot to kill. A jury that accepted this much of the state's case—as this jury necessarily did when it rejected defendant's claim of self-defense—could not reasonably have failed to additionally find that defendant "knowingly engag[ed] in criminal activities known to carry a grave risk of death," that the death of all the victims was reasonably foreseeable, and that defendant proceeded in conscious indifference to that risk.

Judge Gerber suggests that the law forfeits respect in cases such as this by holding a felon culpable for an "unpredictable" reactive killing by his victim. I disagree. The victim's reaction in this case was all too predictable. When defendant launched a shooting war, he knew or should have known that when the body count was taken, his companions might be found among the dead. The law may properly impose responsibility for each death defendant caused.

This is not to say that the felony murder rule is the best way for the law to do so; there is reason to debate in other forums whether there are better means to enhance

the punishment of a felon whose crime results in foreseeable but unintended death. The legislature has promised a re-evaluation of our criminal code, and Judge Gerber's criticisms warrant thoughtful evaluation when that occurs. I am not a legislator, however, and, finding adequate proof of culpability in the case at hand, I join in the majority decision.